## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

BARBARA SCAYLES, as Personal Representative )
of the Estate of ULYSSES G. WILLIAMS; JULIE )
MCAFEE on behalf of A███ W█████, a )
minor; A█████ W████████, a legal minor; and )
NICOLE BERRIOS, on behalf of P██████ )
B███████, a minor, )
    Plaintiffs, ) Case No 3:19-cv-1311-J-34PDB
v. )
MARK S. INCH, Secretary of Florida Department )
of Corrections; CENTURION OF FLORIDA, LLC; )
MHM HEALTH PROFESSIONALS, LLC; )
GERARDO PEDROZA-SIERRA, M.D.; )
JACKSONVILLE CARDIOVASCULAR CENTER, )
P.L.; and WADDAH SALMAN, M.D., )
    Defendants. )

### AMENDED COMPLAINT

**COMES NOW**, Plaintiffs, BARBARA SCAYLES, as Personal Representative of the

Estate of ULYSSES G. WILLIAMS; JULIE MCAFEE on behalf of A████ W█████, a

minor; A████ W████████, a legal minor; and NICOLE BERRIOS, on behalf of P█████

B███████ a minor; by and through their undersigned counsel, and files this *Amended Complaint*

against Defendants, MARK S. INCH, Secretary of Florida Department of Corrections;

CENTURION OF FLORIDA, LLC; MHM HEALTH PROFESSIONALS, LLC; GERARDO

PEDROZA-SIERRA, M.D.; JACKSONVILLE CARDIOVASCULAR CENTER, P.L.; and

WADDAH SALMAN, M.D. and alleges the following:

### JURISDICTIONAL ALLEGATIONS

1.    This is an action in excess of this Court's jurisdictional threshold.

2.    Plaintiffs' claims are made pursuant to Fla. Stat. 95.11; Fla. Stat. 766; 768.16 et seq.;

    768.28; 42 U.S.C. Sections 1983 and 1988; and, the 8th Amendment to the United States

    Constitution.

3.   Plaintiffs hereby invoke supplemental jurisdiction of the United States District Court to adjudicate supplemental state tort claims arising under Florida law pursuant to 28 U.S.C. Section 1367 and further invokes the jurisdiction of the United States District Court pursuant to 28 U.S.C. Sections 1331 and 1343.

**PARTIES**

4.   Ulysses G. Williams ("Mr. Williams") was an adult resident of the State of Florida, and inmate residing in the Reception and Medical Center (RMC), Florida Department of Corrections (FL DOC) facility located in the City of Lake Butler, Union County, Florida, at the time of his death.  Mr. Williams is survived by his biological parent, Barbara Scayles, personal representative of his estate.  Mr. Williams' claim is presented by Barbara Scayles.

5.   Barbara Scayles ("Mrs. Scayles") is an adult resident of the State of Florida domiciled in Duval County.  Mrs. Scayles was appointed personal representative on the decedent's behalf.  She consolidates her survivor statutory claims on her own behalf with Mr. Williams' wrongful death claims.

6.   A▮▮ W▮▮▮▮ ("A▮ W▮▮▮") is the biological child of Mr. Williams.  She was a dependent minor and resident of the State of Florida domiciled in Duval County, at the time of the decedent's death.  A▮▮ is presently a legal minor.

7.   P▮▮ B▮▮ ("P▮▮▮") is the biological child and minor survivor of Mr. Williams. Nicole Berrios, is the biological parent of P▮▮ B▮▮▮, and brings claims on behalf of her minor child.

8.   Mark S. Inch ("FL DOC"), is sued in his official capacity as the Secretary of the Florida Department of Corrections.  At all times material hereto, FL DOC was the state official

ultimately responsible for operating and managing the Florida Department of Corrections ("FL DOC"), including its medical staff at Florida prison facilities, and ultimately responsible for providing appropriate medical care to the inmate population.

9.     Centurion of Florida, LLC, ("Centurion") was the sole contractor with FL DOC, contracted to provide comprehensive healthcare services to FL DOC's inmates housed in the correctional institutions and satellite facilities. At all times material hereto, Centurion was responsible for managing and operating a comprehensive health care service delivery system for FL DOC, and was required to deliver healthcare services that met legal and professional standards of care.

10.    MHM Health Professionals, LLC ("MHM"), a Florida limited liability corporation, was a subcontractor of Centurion that engaged Dr. Gerardo Pedroza-Sierra as its medical healthcare agent. At all times material to this action, MHM was a subcontractor, contracted to provide medical services to FL DOC in its correctional facilities.

11.    Dr. Gerardo Pedroza-Sierra ("Dr. Pedroza") is a Florida licensed medical physician engaged as a medical healthcare agent of MHM. At all times material to this action, Dr. Pedroza provided medical services to inmates housed within the FL DOC, at the RMC facility located in Lake Butler, Florida, pursuant to and or under the contractual agreement between MHM and Centurion.

12.    Jacksonville Cardiovascular Center, P.L., ("JCC"), a Florida professional limited company located in Jacksonville, Florida, was a subcontractor of Centurion that engaged Dr. Waddah Salman as its medical healthcare agent. At all times material to this action, JCC was a subcontractor, contracted to provide medical services to FL DOC in its correctional facilities.

13.     Dr. Waddah Salman ("Dr. Salman") is a Florida licensed medical physician engaged as a healthcare agent of JCC. He is also the president and sole member of JCC. At all times material to this action, Dr. Salman provided medical services to inmates housed within the FL DOC, RMC facility located in Lake Butler, Florida, pursuant to and or under the contractual agreement between JCC and Centurion.

14.     FL DOC was responsible for developing a comprehensive health care delivery system and promulgating all department health care standards. Such health care standards included, but were not limited to, rules relating to the management structure of the health care system and the provision of health care services to inmates, health care policies, health care plans, quality management systems and procedures, health service bulletins, and treatment protocols.

15.     At all times material hereto, FL DOC engaged physicians and para-medical persons, directly or indirectly who provided healthcare services to Mr. Williams.

16.     At all times material hereto, MHM and JCC consisted of physicians and para-medical persons who, directly or indirectly provided healthcare services to Mr. Williams.

17.     At all times material, Centurion, MHM, Dr. Pedroza, JCC and Dr. Salman were agents or contracted medical providers of FL DOC.

18.     In this cause, FL DOC acted through agents or contracted providers,  to wit: Centurion, MHM, Dr. Pedroza, JCC, and Dr. Salman.

19.     In this cause, MHM and JCC acted through their agents, employees or contracted providers and Dr. Pedroza and Dr. Salman, respectively.

20.     All physical acts and occurrences material to this cause of action were committed in Union County, Florida.

## CONDITIONS PRECEDENT

21. Plaintiffs forwarded written notice of intent to pursue redress for claims pursuant to Fla. Stat. 768 and 766.106 via certified mail, return receipt to Defendant FL DOC, Centurion, MHM, Dr. Pedroza, JCC, Dr. Salman and the Florida Department of Financial Services, Division of Risk Management.

22. Notice was imputed to MHM pursuant to Fla. R. Civ. P. 1.650.

23. Barbara Scayles has been appointed personal representative of the Estate of Ulysses Williams, with full power under the laws of the State of Florida to administer the decedent's estate, demand and sue on behalf of the estate by letters of administration issued by the Circuit Court, Probate Division, in and for Duval County, Florida.

24. The undersigned has undertaken a good faith investigation of the facts alleged herein and has determined that reasonable grounds exist to initiate a claim for medical negligence. All conditions precedent presented by F.S. Chapter 766 have been satisfied.

25. The decedent's medical history and relevant treatment records were examined by medical experts qualified, pursuant to F.S. Chapter 766. Written affidavits regarding same were provided to FL DOC, Centurion, MHM, Dr. Pedroza, JCC and Dr. Salman.

26. FL DOC denied liability in writing on September 4, 2019.

27. Centurion and Dr. Pedroza denied liability in writing on December 20, 2019.

28. JCC and Dr. Salman denied liability in writing on December 20, 2019.

29. All other conditions precedent to the prosecution of this action have occurred, or have been performed, excused or waived, including the decedent's exhaustion of administrative remedies precedent to the present claim.

## GENERAL ALLEGATIONS & FACTS COMMON TO ALL COUNTS

30.　On or about June 30, 2015, Mr. Williams was transported and delivered to FL DOC, Reception and Medical Center in Lake Butler, Florida (RMC), where he received multiple medical evaluations thereafter for approximately nine (9) days.

### Medical History & Initial Healthcare Treatment

31.　The above medical evaluations showed that Mr. Williams was obese, with a history of type 2 diabetes and hypertension.

32.　Mr. Williams was subsequently transferred to the FL DOC facility located in Graceville, Florida, where he remained for approximately 17 months, during which time he received medical treatment for obesity, diabetes and hypertension.

33.　Although Mr. Williams was diagnosed and treated for obesity, diabetes, hypertension, he was also diagnosed with dyslipidemia/high cholesterol while at the Graceville Department of Corrections (DOC) facility. FL DOC medical records show that the aforementioned chronic healthcare issues were intermittently uncontrolled, but not imminently life threatening.

34.　Between August and December 2016, Mr. Williams made several administrative, written complaints and requests to the medical staff at Graceville DOC regarding chronic chest pain, as evident from the Inmate Sick-Call Request forms.

35.　Mr. Williams' FL DOC medical records document over ten (10) medical consultations related to chest pain on the department's Chronological Record of Health Care, Chest Pain Protocol and Chronic Illness Clinic forms.

36.     Diagnostic tests were performed on Mr. Williams' between August 2016 and January 2017 while at the Graceville DOC facility. His EKGs returned abnormal results indicating an inferior myocardial infarct, meaning Mr. Williams had suffered a previous heart attack.

**January 19, 2017 - Cardiology Consultation at Graceville DOC**

37.     On January 19, 2017, a cardiology consultation was requested by Mr. Williams' primary care physician ("PCP") requiring Mr. Williams' transfer from the Graceville FL DOC facility back to RMC. The PCP stated that Mr. Williams:

- was experiencing "on and off chest pain, retrosternal and more to the right side of the chest, radiating to his back."
- had a history of diabetes, dyslipidemia and hypertension.
- complained of shortness of breath and chest pain when exercising.

The request concluded with the PCP stating that since there were "some cardiac symptoms with abnormal EKG, risk factors for CAD [coronary artery disease], I would like a cardiologist [to] assist with further work out (stress test/cath)."

38.     The PCP also provided a summary of the diagnostic test results as well as a provisional diagnosis of "chronic chest pain, possible inferior infarct, R/O CAD [rule out coronary artery disease]."

39.     On or around February 7, 2017, Mr. Williams was transferred to RMC for his cardiology consult.

**February 9, 2017 & March 16, 2017 - Cardiology Consultation at RMC with Dr. Waddah Salman**

40.     Dr. Waddah Salman is the cardiologist who examined Mr. Williams on February 9, 2017. Dr. Salman was provided Mr. Williams' medical chart, where review of same revealed

that Mr. Williams was high risk for a heart attack. The chart detailed the Graceville FL

DOC medical notes.

41.     Mr. Williams' consult with Dr. Salman on February 9, 2017, also verified additional risk

        factors, such as a history of smoking and a maternal family history of coronary artery

        disease. The Consultant Report also stated that Mr. Williams experienced intermittent

        episodes of chest pain for the preceding 7 months, where the pain was described as chest

        pressure radiating into his back, usually associated with shortness of breath, occurring

        with activity and lasting for several minutes consistent with typical angina.

42.     Accordingly, Dr. Salman recommended with urgency that Mr. Williams undergo a

        Lexiscan Nuclear Stress Test.

43.     The nuclear stress test was performed on March 16, 2017, at RMC. Dr. Salman oversaw

        and evaluated the nuclear stress test and an EKG of Mr. Williams performed at RMC on

        March 16, 2017.

44.     The final impression dictated by Dr. Salman stated, in part:

        *"Abnormal perfusion scan. There is evidence for mild ischemia
        involving the mid to basilar portion of the anterior wall. There
        is also evidence for large defect with partial reversibility
        involving the inferior and inferolateral walls consistent with
        prior myocardial infarction with mild peri-infarct ischemia
        especially toward the mid portion of the inferolateral wall.
        There is also evidence for moderate size fixed epical defect
        consistent with prior myocardial infarction..."*

45.     Although the nuclear stress test results were abnormal, consistent with a prior heart attack

        and coronary blockages, which constituted high risk for future heart attack, no further

        medical action was ordered by Dr. Salman to coordinate urgent care for Mr. Williams or

        follow up with immediate heart catherization that would have located narrowing or

blockages in or near Mr. Williams' heart where angioplasty (with or without stent placement) could have been performed to widen the narrowed arteries.

### March 24, 2017 (Morning) – First Examination at RMC Urgent Care with Dr. Gerardo Pedroza

46. On the morning of March 24, 2017, Mr. Williams presented to the RMC urgent care unit with complaints of epigastric and chest pain and was examined by Dr. Gerardo Pedroza.

47. Through the patient encounter, Dr. Pedroza was aware that:

- Mr. Williams was experiencing epigastric pain and chest pain.
- The chest pain radiated down Mr. Williams' back.
- The intensity of chest pain was described by Mr. Williams as an 8 out of 10.
- Mr. Williams had been experiencing recurring chest pain since arriving at RMC.
- Mr. Williams was an inmate at RMC specifically for a cardiac consultation.
- Mr. Williams had a history of hypertension, diabetes and dyslipidemia.
- Mr. Williams was obese. He weighed 228 pounds and was about 6 feet tall.
- There was a maternal family history of coronary heart disease.

48. Dr. Pedroza had access to Mr. Williams' entire medical chart at the time of the patient encounter.

49. Dr. Pedroza recalled that the nuclear stress test results were not contained in Mr. Williams' medical chart; however, the remaining medical records still indicated that Mr. Williams was high risk for a subsequent heart attack, and also included the following information:

- Mr. Williams experienced intermittent episodes of chest pain for the past 7 months.
- Angina radiated into his back and was usually associated with shortness of breath.
- Chest pain occurring with activity, lasting up to several minutes.
- Mr. Williams had hypertension, diabetes, and dyslipidemia.
- Mr. Williams was a smoker until 3 years prior to the record's creation.
- Mr. Williams' mother was diagnosed with coronary artery disease.
- A Lexiscan nuclear stress test was ordered urgently by a cardiologist.

50.   Another EKG was performed and reviewed by Dr. Pedroza.  The results were abnormal, revealing sinus tachycardia and a possible anterior myocardial infarction, age undetermined.

51.   Dr. Pedroza's medical notes do not indicate a review of any past medical records, nor does the plan of treatment include provisions for cardiac related recurring chest pains, the referral for a cardiology consult, or the initial cardiology consult itself.

52.   Dr. Pedroza ultimately diagnosed Mr. Williams with epigastric pain, treated him with prescription medications consisting of Tylenol, Lidocaine, Maalox, and Protonix and then subsequently discharged him from the RMC urgent care unit to return to general inmate population.

53.   On the morning of March 24, 2017, Mr. Williams was, in fact, experiencing classic symptoms of a heart attack (recurrent chest pain/pressure; chest pain radiating to neck, jaw or back; abdominal pain/heartburn), that was not diagnosed.

54.   Mr. Williams was not administered pure aspirin or nitroglycerin, to prevent clotting or increase blood flow through the arteries, respectively, both of which are critical for a person who is experiencing a heart attack.

55.   Finally, during this first examination, Dr. Pedroza did not order blood labs to determine the presence of troponin, an enzyme that is indicative of the diagnosis for a heart attack. The blood lab test is routine and  commonly used to determine the presence of myocardial infarction.

## March 24, 2017 (Evening) – Second Examination at RMC Urgent Care with Dr. David Rodriguez

56. Several hours later, during the early evening of March 24, 2017, Mr. Williams presented to Dr. Rodriguez at the RMC urgent care center again, complaining of epigastric and chest pain again, stating he felt the same as earlier during his first visit.

57. Dr. Rodriguez's medical notes reflected that he treated Mr. Williams as having a heart attack. Dr. Rodriguez also noted his review of Mr. Williams' medical records as well as the fact that no tests were performed to determine the presence of cardiac enzymes.

58. FL DOC's chest pain protocol (consisting of monitoring vital signs, administering nitroglycerin and aspirin, delivering oxygen, repositioning of the body, conducting an EKG, and starting an IV of normal saline) was performed while awaiting transfer of Mr. Williams to Shand's Hospital. Mr. Williams became non-responsive. An emergency code was initiated, and Mr. Williams expired.

59. Mr. Williams did not expire until over 8 hours after the initial March 24th morning medical encounter. There was ample time to obtain blood labs and transfer Mr. Williams to Shand's Hospital for life-saving treatment.

60. Findings in the postmortem examination of Mr. Williams included stenosis of 90-95% in the left coronary artery; stenosis of up to 98% in the right coronary artery; evolving myocardial infarct in the posterolateral wall of the left cardiac ventricle; and ischemic heart disease as cause of death.

61. Mr. Williams died of a heart attack caused by significant untreated or unmitigated blockages in the coronary arteries.

**April 21, 2017 - Dr. Waddah Salman's Delayed Decedent's Medical Records Creation of Abnormal Stress Test Results**

62. JCC and or Dr. Salman utilized SmartMD service for dictation and transcription of medical notes for patients seen by Dr. Salman at RMC. Specifically, this service was used for the dictation and transcription of medical notes pertaining to Mr. Williams' Lexiscan Nuclear Stress Test results.

63. According to SmartMD's records, the abnormal Lexiscan Nuclear Stress Test results were not dictated by Dr. Waddah Salman until April 21, 2017. The results were subsequently transcribed on April 22, 2017.

64. The FL DOC represents that it did not receive Mr. Williams' abnormal stress test results until after Mr. Williams died at the RMC facility on March 24, 2017.

65. FL DOC's representation is further corroborated by a handwritten note on the top of the Lexiscan Nuclear Stress Test results, which states "Deceased."

66. Furthermore, it is policy of Centurion that medical notes for patient encounters with specialist physicians be submitted to the FL DOC "on-site practitioner with complete consult report and other appropriate records within 5 business days of seeing the inmate patient."[1]

## COUNT I (ONE)

## WRONGFUL DEATH AGAINST DEFENDANT, DR. WADDAH SALMAN PURSUANT TO FLORIDA STATUTE 766, FLORIDA MEDICAL MALPRACTICE

For this cause of action against Defendant Dr. Salman in Count I, Plaintiffs re-allege and adopt, as if fully set forth, the allegations contained in paragraphs 1-45 and 60-66, and further state as follows:

---

[1] Centurion of Florida Provider Manual, Pg. 12, February 2016.

67.  At all times material, Dr. Salman provided health care services to Mr. Williams.

68.  At all times material, Dr. Salman owed a duty to Mr. Williams to use a level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by similar reasonably prudent health care providers.

69.  On and after March 16, 2017, Dr. Salman negligently breached his professional duty to Mr. Williams in one or more of the following particulars including, but not limited to, his

*negligent failure to:*

a.  communicate or convey abnormal coronary stress test results showing blockages in the decedent's heart to on-site continuing primary care physician;

b.  coordinate patient's condition and need for inmediate care with the FL DOC on-site medical practitioner;

c.  adequately train and supervise JCC personnel tasked with facilitating communication of abnormal coronary stress tests to FL DOC staff;

d.  adequately train and supervise personnel tasked with assisting in follow-up medical treatment with FL DOC;

e.  document communication between himself, as the practitioner responsible for his patient's care regarding the cardiac referral, and any other health care professional who contributed to the patient's care;

f.  obtained prompt surgical intervention and make immediate arrangements for cardiac catherization;

g.  timely create and submit into the decedent's medical chart the medical notes regarding consultation and abnormal diagnostic test results, where SmartMD's (transcription company) records reflect that medical notes regarding Mr. Williams' consultation and stress test exam on March 16, 2017, were not dictated until over one month after the decedent's death;

h.  properly consider and find Mr. Williams as high risk for a heart attack, despite knowledge of Mr. Williams' medical history which included uncontrolled hypertension, diabetes, and dyslipidemia; smoking; obesity; history of a prior myocardial infarct in 2016 (contained in EKG result and Lexiscan Stress Test result); family history of coronary artery disease; and over 7-months history of chest pain described as pressure that radiated into his back accompanied with shortness of breath;

i.  timely diagnose decedent's condition of coronary artery disease;

j.  provide that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by reasonably prudent similar physician; and

k. recognize that performing any one or combination of the above tasks would   have prevented Mr. Williams' death on March 24, 2017;

70. As a direct and proximate result of the negligence of the Salman, Mr. Williams suffered a myocardial infarction on March 24, 2017, at the FL DOC RMC facility, and died.

71. As a direct and proximate result of Dr. Salman's negligence, Mr. Williams experienced pain, suffering and anxiety preceding his death.  Barbara Scayles, on behalf of herself and also the Estate of Ulysses G. Williams sustained loss of net accumulations, support, services, companionship, protection, estate administration, financial assessments, legal expenses, and funeral with burial costs.

72. As a direct and proximate result of the negligence of Dr. Salman and the resulting death of Mr. Williams, Plaintiffs, Julie McAfee on behalf of A█████ W█████, a minor; A█████ W█████, a legal minor; Nicole Berrios, on behalf of P█████ B█████, a minor, has suffered, and will suffer in the future, the following damages: loss of support and services, loss of companionship and protection, mental pain and suffering and loss of parental companionship, instruction, and guidance.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Dr. Salman for compensatory damages, costs of suit, reasonable attorney's fees, trial by jury as to all issues so triable and such other relief as this Honorable Court may deem just and appropriate.

## COUNT II (TWO)

## CLAIM AGAINST DEFENDANT, JACKSONVILLE CARDIOVASCULAR CENTER, P.L., FOR THE ACTIONS OF DR. WADDAH SALMAN

For this cause of action against Defendant Jacksonville Cardiovascular Center, P.L., in Count II, Plaintiffs re-allege and adopt, as if fully set forth, the allegations contained in paragraphs 1-45 and 60-66, and further states as follows:

73.     On or around April 26, 2016, Jacksonville Cardiovascular Center, P.L. ("JCC") entered
        into a year-long contract with Centurion of Florida, LLC ("Centurion") to provide certain
        medical services to the inmates of FL DOC in exchange for monetary compensation.

74.     At all times relevant, Dr. Salman was the President, and a physician agent, of JCC.

75.     At all times relevant, Dr. Salman's actions in providing health care to Mr. Williams was
        controlled by JCC and conducted in fulfillment of its contractual obligations with
        Centurion.

76.     At all times material, Dr. Salman provided health care services to Mr. Williams within
        the course and scope of his agency, for which JCC is vicariously liable.

77.     At all times material, JCC owed a duty to Mr. Williams to use a level of care, skill, and
        treatment which, in light of all relevant surrounding circumstances, was recognized as
        acceptable and appropriate by similar reasonably prudent health care providers.

78.     On and after March 16, 2017, JCC negligently breached their duty to Mr. Williams
        through the actions of its agent, Dr. Salman.

79.     As a direct and proximate result of the negligence of JCC, Mr. Williams suffered a
        myocardial infarction on March 24, 2017, at the FL DOC RMC facility, and died.

80.     As a direct and proximate result Dr. Salman's negligence Mr. Williams experienced pain,
        suffering and anxiety preceding his death.  Barbara Scayles, on behalf of herself and also
        the Estate of Ulysses G. Williams sustained loss of net accumulations, support, services,
        companionship, protection, estate administration, financial assessments, legal expenses,
        and funeral with burial costs.

81.     As a direct and proximate result of Dr. Salman's negligence and the resulting death of
        Mr. Williams, Plaintiffs, Julie McAfee on behalf of A⬛⬛ W⬛⬛, a minor; A⬛⬛

W████s, a legal minor; Nicole Berrios, on behalf of ███ B████ a minor, has suffered, and will suffer in the future, the following damages: loss of support and services, loss of companionship and protection, mental pain and suffering and loss of parental companionship, instruction, and guidance.

**WHEREFORE**, Plaintiffs demand judgment against Defendant JCC for compensatory damages, costs of suit, reasonable attorney's fees, trial by jury as to all issues so triable and such other relief as this Honorable Court may deem just and appropriate.

**COUNT III (THREE)**

**WRONGFUL DEATH AGAINST DEFENDANT, DR. GERARDO PEDROZA
PURSUANT TO FLORIDA STATUTE 766, FLORIDA MEDICAL MALPRACTICE**

For this cause of action against Defendant Dr. Gerardo Pedroza in Court III, Plaintiffs re-allege and adopt, as if fully set forth, the allegations contained in paragraphs 1-39, 46-55 and 60-61, and further state as follows:

82.     At all times material, Dr. Pedroza provided health care services to Mr. Williams.

83.     At all times material, Dr. Pedroza owed a duty to Mr. Williams to use a level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by similar reasonably prudent health care providers.

84.     On March 24, 2017, Dr. Pedroza negligently breached his duty to Mr. Williams in one or more of the following particulars including, but not limited to, his ***negligent failure to:***

   a. review Mr. Williams' medical records containing critical patient medical history, as Mr. Williams' medical records fail to indicate review of same;
   b. review the most recent medical note in Mr. Williams' medical chart, dated February 9, 2017, by Dr. Waddah Salman, which in part stated that Mr. Williams had a history of hypertension, diabetes, dyslipidemia, smoking, obesity, family history of coronary artery disease, 7-month history of chest pain and also stated: "get Lexiscan Nulcear Stress Test (underline)";

    c. consider Mr. Williams' EKG results revealing a prior myocardial infarction; but, instead, ruling out myocardial infarction notwithstanding the   decedent's EKG results;

    d. properly consider myocardial infarction as the basis for the decedent's complaints despite his medical history and EKG results;

    e. order STAT laboratory exams for troponin levels used to diagnose heart attacks;

    f. administer medications to mitigate or neutralize the on-set of cardiac arrest;

    g. diagnose Mr. Williams with a myocardial infarction and prescribe a course of treatment accordingly;

    h. consult with another medical doctor or the treating cardiologist regarding the decedent's complaints and the possibility of myocardial infarction;

    i. document communication between himself, as the practitioner responsible for Mr. William's care at the FL DOC urgent care center, and any other health care professional who contributed to Mr. Williams' care;

    j. refer the decedent to an emergency room in a timely manner to evaluate Mr. Williams for myocardial infarction;

    k. adequately treat Mr. Williams prior to discharge from the RMC urgent care unit;

    l. provide that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by reasonably prudent similar health care providers.

    m. recognize that performing any one or combination of the above tasks would  have prevented Mr. Williams' death on March 24, 2017;

85. As a direct and proximate result of the negligence of the Dr. Pedroza, Mr. Williams suffered a myocardial infarction on March 24, 2017, at the FL DOC RMC facility, and died.

86. As a direct and proximate result of Dr. Pedroza's  negligence, Mr. Williams experienced pain, suffering and anxiety.  Barbara Scayles, on behalf of herself and also the Estate of Ulysses G. Williams sustained loss of net accumulations, support, services, companionship, protection, estate administration, financial assessments, legal expenses, and funeral with burial costs.

87. As a direct and proximate result of the negligence of Dr. Pedroza and the resulting death of Mr. Williams, Plaintiffs, Julie McAfee on behalf of A███ W███, a minor; A███ W███, a legal minor; Nicole Berrios, on behalf of P███ B███, a minor, has suffered, and will suffer in the future, the following damages: loss of support and

services, loss of companionship and protection, mental pain and suffering and loss of parental companionship, instruction, and guidance.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Dr. Pedroza for compensatory damages, costs of suit, reasonable attorney's fees, trial by jury as to all issues so triable and such other relief as this Honorable Court may deem just and appropriate.

**COUNT IV (FOUR)**

**CLAIM AGAINST DEFENDANT, MHM HEALTH PROFESSIONALS, LLC, FOR THE ACTIONS OF DR. GERARDO PEDROZA-SIERRA**

For this cause of action against Defendant MHM Health Professionals, LLC, in Count IV, Plaintiffs re-allege and adopt, as if fully set forth, the allegations contained in paragraphs 1-39, 46-55 and 60-61, and further state as follows:

88. MHM Health Professionals, LLC ("MHM") is a private company that provides healthcare services to state agencies.

89. MHM is part of a joint-venture which is contracted to provide certain medical services to the inmates of FL DOC in exchange for monetary compensation.

90. At all times relevant, Dr. Pedroza was a physician agent of MHM.

91. At all times relevant, Dr. Pedroza's actions in providing health care to Mr. Williams was controlled by MHM and conducted in fulfillment of its contractual obligations in its joint-venture.

92. At all times material, Dr. Pedroza provided health care services to Mr. Williams within the course and scope of his agency, for which MHM is vicariously liable.

93. At all times material, MHM owed a duty to Mr. Williams to use a level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by similar reasonably prudent health care facilities.

94.    On March 24, 2017, MHM negligently breached their duty to Mr. Williams through the actions of its agent, Dr. Pedroza.

95.    As a direct and proximate result of the negligence of MHM, Mr. Williams suffered a myocardial infarction on March 24, 2017, at the FL DOC RMC facility, and died.

96.    As a direct and proximate result of Dr. Pedroza's negligence Mr. Williams experienced pain, suffering and anxiety.  Barbara Scayles, on behalf of herself and also the Estate of Ulysses G. Williams sustained loss of net accumulations, support, services, companionship, protection, estate administration, financial assessments, legal expenses, and funeral with burial costs.

97.    As a direct and proximate result of Dr. Pedroza's negligence, and the resulting death of Mr. Williams, Plaintiffs, Julie McAfee on behalf of A██, W██, a minor; A██, W██, a legal minor; Nicole Berrios, on behalf of P██ B██, a minor, has suffered, and will suffer in the future, the following damages: loss of support and services, loss of companionship and protection, mental pain and suffering and loss of parental companionship, instruction, and guidance.

**WHEREFORE**, Plaintiffs demand judgment against Defendant MHM for compensatory damages, costs of suit, reasonable attorney's fees, trial by jury as to all issues so triable and such other relief as this Honorable Court may deem just and appropriate.

## COUNT V (FIVE)

## WRONGFUL DEATH CLAIM AGAINST DEFENDANT, CENTURION OF FLORIDA, LLC., COGNIZABLE UNDER FLORIDA STATUTE §768.28

For this cause of action against Defendant Centurion of Florida, LLC., in Count V, Plaintiffs re-allege and adopt, as if fully set forth, the allegations contained in paragraphs 1-97 and further state as follows:

98.   At all times relevant, Centurion was contracted with FL DOC to manage all aspects of medical care, including, but not limited to the implementation and operation of a comprehensive health care service delivery system for inmates in the Florida Department of Corrections population.

99.   At all times relevant, both MHM and JCC were subcontractors of Centurion to administer medical care to FL DOC inmates.

100.  At all times relevant, both MHM and JCC's physician agents provided medical care to FL DOC inmates, in fulfillment of MHM's and JCC's contractual obligations with Centurion.

101.  Dr. Pedroza was an agent of MHM Health Professionals, LLC ("MHM").

102.  Dr. Salman was an agent of Jacksonville Cardiovascular Center, P.L. ("JCC").

103.  At all times material Centurion entered into and maintained a legal relationship with MHM, Dr. Pedroza, JCC and Dr. Salman to provide health care services to Mr. Williams. Centurion owed a duty to Mr. Williams to use a level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by similar and reasonable health care providers.

104.  On March 16, 2017, JCC and Dr. Salman, and on March 24, 2017, MHM and Dr. Pedroza, as agents of Centurion, provided health care services to Mr. Williams and committed the following acts or omissions against him, to wit: as enumerated in Paragraphs 69 a-k, and 84 a-m, respectively.

105.  As a direct and proximate result of the acts of Centurion, acting by and through Dr. Salman and Dr. Pedroza, Mr. Williams suffered a myocardial infarction on March 24, 2017, at the FL DOC RMC facility, and died.

106. As a direct and proximate result of Dr. Salman's and Dr. Pedroza's actions, Mr. Williams experienced pain, suffering and anxiety. Barbara Scayles, on behalf of herself and also the Estate of Ulysses G. Williams sustained loss of net accumulations, support, services, companionship, protection, estate administration, financial assessments, legal expenses, and funeral with burial costs.

107. As a direct and proximate result of Dr. Salman's and Dr. Pedroza's actions and the resulting death of Mr. Williams, Plaintiffs, Julie McAfee on behalf of A█████ W█████s, a minor; A███ W█████, a legal minor; Nicole Berrios, on behalf of P███ B█████ a minor, has suffered, and will suffer in the future, the following damages: loss of support and services, loss of companionship and protection, mental pain and suffering and loss of parental companionship, instruction, and guidance.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Centurion for compensatory damages, costs of suit, reasonable attorney's fees, trial by jury as to all issues so triable and such other relief as this Honorable Court may deem just and appropriate.

## COUNT VI (SIX)
## CLAIM AGAINST DEFENDANT, MARK S. INCH, SECRETARY OF FLORIDA DEPARTMENT OF CORRECTIONS, IN HIS OFFICIAL CAPACITY, COGNIZABLE UNDER FLORIDA STATUTE 768.28

For this cause of action against Defendant FL DOC in Count VI, Plaintiffs re-allege and adopt, as if fully set forth, the allegations contained in paragraphs 1-107 and further state as follows:

108. At all times relevant, FL DOC was responsible for developing and implementing a comprehensive health care delivery system for inmates in the Florida Department of Corrections population.

109.   At all times relevant, FL DOC  had a duty to administer, and manage all aspects of medical care, including, but not limited to the implementation and operation of a comprehensive health care service delivery system, delivering appropriate health care services that met constitutional and professional standards of health care.

110.   At all times material, FL DOC was engaged in a legal relationship with Centurion to provide health care services to Mr. Williams. FL DOC owed a duty to Mr. Williams to use a level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by similar and reasonable health care providers.

111.   On March 16th and 24th, 2017, FL DOC through Centurion's agents or subcontractors, specifically, Dr. Salman and Dr. Pedroza, committed the following acts or omissions against Mr. Williams, to wit: as enumerated in Paragraphs 69 a-k, and 84 a-m, respectively.

112.   As a direct and proximate result of the actions of the FL DOC, acting by and through Centurion's agents or subcontractors, Mr. Williams suffered a myocardial infarction on March 24, 2017, at the FL DOC RMC facility, and died.

113.   As a direct and proximate result of Dr. Salman's and Dr. Pedroza's actions Mr. Williams experienced pain, suffering and anxiety.  Barbara Scayles, on behalf of herself and also the Estate of Ulysses G. Williams sustained loss of net accumulations, support, services, companionship, protection, estate administration, financial assessments, legal expenses, and funeral with burial costs.

114.   As a direct and proximate result of the actions of Dr. Salman and Dr. Pedroza and the resulting death of Mr. Williams, Plaintiffs, Julie McAfee on behalf of A■■■ W■■■ ■, a

minor; A█████ W█████ a legal minor; Nicole Berrios, on behalf of P████ B█████, a minor, has suffered, and will suffer in the future, the following damages: loss of support and services, loss of companionship and protection, mental pain and suffering and loss of parental companionship, instruction, and guidance.

**WHEREFORE**, Plaintiffs demand judgment against Defendant FL DOC for compensatory damages, costs of suit, reasonable attorney's fees, trial by jury as to all issues so triable and such other relief as this Honorable Court may deem just and appropriate.

## COUNT VII (SEVEN)
## CLAIM AGAINST DEFENDANT, DR. WADDAH SALMAN, IN HIS INDIVIDUAL CAPACITY UNDER 42 U.S.C. §1983

For this cause of action against Defendant Dr. Waddah Salman in Count VII, Plaintiffs re-allege and adopt, as if fully set forth, the allegations contained in paragraphs 1-45 and 60-66, and further state as follows:

115.   At all times material, Dr. Salman was acting under color of law or rights secured to Mr. Williams by the Eighth Amendment to the United States Constitution within the meaning of 42 U.S.C. §1983.

116.   At all times material, Dr. Salman diagnosed or knew Mr. Williams had a serious medical condition.   Specifically Dr. Salman knew Mr. Williams endured over 7 months of intermittent chest pain; that Mr. Williams sustained a past heart attack; and that he exhibited multiple health issues including obesity, diabetes, hypertension and dyslipidemia that constituted high-risk for a subsequent heart attack.

117.   Dr. Salman evidenced his knowledge of Mr. Williams' serious medical need as indicated in his February 9, 2017, medical note requesting a Lexiscan Nuclear Stress Test with *urgency* which was subsequently confirmed by the abnormal nuclear stress test results.

118.   Dr. Salman knew that Mr. Williams needed immediate follow-up treatment for his serious medical need.

119.   Dr. Salman's acts and omissions were harmful towards Mr. Williams' serious medical needs  and resulted in prolonged, progressive, unnecessary and wanton infliction of pain upon Mr. Williams with his future heart attack(s) on March 24, 2017, that ultimately caused his death.

120.   Dr. Salman's deliberate indifference towards Mr. Williams' serious medical needs, after becoming aware of Mr. Williams' intermittent chest pain, heart attack history, obesity, diabetes, hypotension and dyslipidemia was the proximate cause of, or significantly contributed to Mr. Williams' death, by heart attack.

121.   Mr. Williams' denial of treatment by Dr. Salman, was done consciously, knowingly, with reckless disregard of the substantial and excessive risk of harm to Mr. Williams, and in violation of Mr. Williams' rights under the Eighth Amendment to the United States Constitution.

122.   The deprivation of the decedent's rights or privilege was occasioned by Dr. Salman's actions under color of state law to provide medical care to inmates which is a function traditionally within the prerogative of the State of Florida, by virtue of Mr. Williams' inmate status.

123.   Dr. Salman acted in concert with, and obtained significant aid from state officials and the state's proxy during the diagnosis, treatment and failure to wholly leave Mr. Williams untreated as set forth in the present complaint.

124.   As a direct and proximate result of Dr. Salman's actions Mr. Williams experienced pain, suffering and anxiety.  Barbara Scayles, on behalf of herself and also the Estate of

Ulysses G. Williams sustained loss of net accumulations, support, services, companionship, protection, estate administration, financial assessments, legal expenses, and funeral with burial costs.

125. As a direct and proximate result of Dr. Salman's actions and the resulting death of Mr. Williams, Plaintiffs, Julie McAfee on behalf of A███ W█████, a minor; A███ W██████ a legal minor; Nicole Berrios, on behalf of P███ B████, a minor, has suffered, and will suffer in the future, the following damages: loss of support and services, loss of companionship and protection, mental pain and suffering and loss of parental companionship, instruction, and guidance.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Dr. Salman for compensatory damages, costs of suit, reasonable attorney's fees pursuant to 42 U.S.C. §1988, trial by jury as to all issues so triable and such other relief as this Honorable Court may deem just and appropriate.

## COUNT VIII (EIGHT)
## CLAIM AGAINST DEFENDANT, DR. GERARDO PEDROZA, IN HIS INDIVIDUAL CAPACITY UNDER 42 U.S.C. §1983

For this cause of action against Defendant Dr. Gerardo Pedroza in Count VIII, Plaintiffs re-allege and adopt, as if fully set forth, the allegations contained in paragraphs 1-39, 46-55 and 60-61, and further state as follows:

126. At all times material, Dr. Pedroza was acting in his individual capacity, under color of law or rights secured to Mr. Williams by the Eighth Amendment to the United States Constitution within the meaning of 42 U.S.C. §1983.

127.    Dr. Pedroza failed to review Mr. Williams' medical chart containing critical medical history and also failed to inquire into and ascertain facts necessary to administer Mr. Williams' health care.

128.    In the alternative, at all times material, Dr. Pedroza knew Mr. Williams had a serious medical need as indicated by Mr. Williams' medical history; Dr. Salman's February 9, 2017, medical note requesting a Lexiscan Nuclear Stress Test with *urgency*; Mr. Williams' symptoms on the morning of March 24, 2017;  and EKG result, all of which indicated that Mr. Williams was not only high-risk for a heart attack, but also was experiencing a heart attack on the morning of March 24, 2017.

129.    Dr. Pedroza knew of, and failed to treat Mr. Williams' serious medical need, which required an immediate evaluation of the decedent's blood labs for troponin levels to determine whether Mr. Williams was experiencing, or had recently experienced, a heart attack and or  the need for immediate follow-up treatment of, or evaluation for life sustaining measures to address his serious medical need.

130.    Dr. Pedroza denied treatment of Mr. Williams' serious medical need which resulted in prolonged, progressive, unnecessary and wanton infliction of pain upon Mr. Williams and furthered significant injury to him resulting in a heart attack(s) on March 24, 2017, that ultimately caused his death.

131.    Dr. Pedroza denied medical treatment with deliberate indifference to Mr. Williams' serious medical needs.

132.    The deprivation of the decedent's rights or privilege was occasioned by Dr. Pedroza's actions under color of state law to provide medical care to inmates which is a function

traditionally within the prerogative of the State of Florida, by virtue of Mr. Williams' inmate status.

133. Dr. Pedroza acted in concert with, and obtained significant aid from state officials and the state's proxy during the diagnosis, treatment and failure to wholly leave Mr. Williams untreated as set forth in the present complaint.

134. Mr. Williams' denial of treatment by Dr. Pedroza, was done consciously, knowingly, with reckless disregard of the substantial and excessive risk of harm to Mr. Williams, and with deliberate indifference in violation of Mr. Williams' rights under the Eighth Amendment to the United States Constitution.

135. As a direct and proximate result of Dr. Pedroza's actions, Mr. Williams experienced pain, suffering and anxiety. Barbara Scayles, on behalf of herself and also the Estate of Ulysses G. Williams sustained loss of net accumulations, support, services, companionship, protection, estate administration, financial assessments, legal expenses, and funeral with burial costs.

136. As a direct and proximate result of the actions of Dr. Pedroza and the resulting death of Mr. Williams, Plaintiffs, Julie McAfee on behalf of A███ W██████ a minor; A█████ W██████ a legal minor; Nicole Berrios, on behalf of P█████ B████, a minor, has suffered, and will suffer in the future, the following damages: loss of support and services, loss of companionship and protection, mental pain and suffering and loss of parental companionship, instruction, and guidance.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Dr. Pedroza for compensatory damages, costs of suit, reasonable attorney's fees pursuant to 42 U.S.C. §1988,

trial by jury as to all issues so triable and such other relief as this Honorable Court may deem just and appropriate.

## COUNT IX (NINE)
## CLAIM AGAINST DEFENDANT, CENTURION UNDER 42 U.S.C. §1983

For this cause of action against Defendant Centurion in Count IX, Plaintiffs re-allege and adopt, as if fully set forth, the allegations contained in paragraphs 1-97 and 115-136, and further state as follows:

137. At all times relevant, Centurion was contracted by FL DOC to manage and operate a comprehensive health care service delivery system for the Florida Department of Corrections.

138. At all times relevant, the agents and subcontractors of Defendant Centurion acted under color of law as agents of FL DOC by providing health care services to the FL DOC inmates.

139. At all times relevant, Centurion was responsible for maintaining constitutional and professional standards of medical care with rules and standards relating to the management structure of the health care system and the provision of health care services to inmates, health care policies, health care plans, quality management systems and procedures, health service bulletins, and treatment protocols.

140. Mr. Williams was an inmate resident at a FL DOC facility. During this time frame, as alleged and incorporated by reference, he was examined by Dr. Salman and Dr. Pedroza and found to have a serious medical need in the form of coronary artery disease.

141. The medical need if left unattended posed a risk of substantial serious harm. Mr. Williams had repeated chest pain and a medical history of health factors that indicated he was high risk for a heart attack, yet after his Lexiscan Nuclear Stress Test which was

performed at FL DOC RMC facility, Centurion, through its agents or subcontractors, delayed and thereby denied urgent follow-up medical care needed to evaluate, diagnose and treat Mr. Williams for coronary artery disease.

142. On the morning of March 24, 2017, Mr. Williams was evaluated and treated pursuant to Centurion's Chest Pain Protocol, which did not include blood testing review for determination of troponin levels that would indicate whether Mr. Williams was having, or had recently experienced a heart attack and remained a present risk of substantial and serious medical harm.

143. Plaintiff had a constitutionally protected right or privilege under 42 U.S.C. §1983, for Centurion acting as a state agent under color of state law to be afforded reasonable medical care.

144. At all times relevant, Centurion violated Plaintiff's constitutional rights through use of the Chest Pain Protocol custom, policy or practice of:

   a. Deliberately delaying diagnosis of, and consequently treatment for, patients with serious medical needs of cardiac care beyond that which FL DOC facilities can adequately and safely handle in order to avoid and circumvent a requirement of transporting patients to non-governmental agency hospital facilities for costly treatment.
   b. Utilizing a mandatory, inadequate and antiquated Chest Pain Protocol, that does not mandate a basic and medically necessary testing for troponin levels to determine whether a patient is experiencing, or has recently experienced, a heart attack or life threatening coronary disease.
   c. Denying urgent and necessary medical treatment for serious medical needs related to chest pain until the patient has reached the direst emergency medical condition and medical instability.
   d. Providing inadequate medical care to patients with chest pain, even when the chest pain protocol (although inadequate) indicates, or does not rule out, that the patient is experiencing a myocardial infarction.

145. At all times relevant, Centurion failed to establish and maintain a system of ready access to adequate medical care by delaying and denying medical evaluation and treatment of

serious medical needs for patients in cardiac distress. The policy created a substantial risk of harm resulting in deliberate indifference to Mr. William's medical needs.

146. Centurion's policies to delay and to deny care were intentionally promulgated in complete disregard for the serious medical needs of the decedent, an inmate, with high risk for a heart attack.

147. The policy was not promulgated on the basis of legitimate options in medical opinion, and were in disregard of the serious medical needs of the decedent inmate.

148. Centurion knew or should have known that the delay or denial of diagnosis or treatment was an excessive risk of harm or death to the Plaintiff.

149. Centurion consciously disregarded this risk in violation of Plaintiff's Eighth Amendment rights.

150. The actions of agents or subcontracted workers of Centurion who provided health care services for Mr. Williams through adherence to Centurion's antiquated Chest Pain Protocol custom, policy or practice rising to the level of deliberate indifference by delaying diagnosis of his serious heart condition, did, in fact result in death.

151. As a direct and proximate result of the agent's or subcontractor's actions, Mr. Williams experienced pain, suffering and anxiety. Barbara Scayles, on behalf of herself and also the Estate of Ulysses G. Williams sustained loss of net accumulations, support, services, companionship, protection, estate administration, financial assessments, legal expenses, and funeral with burial costs.

152. As a direct and proximate result of the agent's or subcontractor's actions, in violation of Mr. Williams' constitutional rights, Plaintiffs, Julie McAfee on behalf of A████ W████, a minor; A████ W████████, a legal minor; Nicole Berrios, on behalf of P█████

B███████ a minor, has suffered, and will suffer in the future, the following damages: loss of support and services, loss of companionship and protection, mental pain and suffering and loss of parental companionship, instruction, and guidance.

**COUNT X (TEN)**

**CLAIM AGAINST DEFENDANT MARK S. INCH, SECRETARY OF FLORIDA DEPARTMENT OF CORRECTIONS IN HIS OFFICIAL CAPACITY, AS COGNIZABLE UNDER 42 U.S.C. §1983**

For this cause of action against Defendant FL DOC in Count X, Plaintiffs re-allege and adopt, as if fully set forth, the allegations contained in paragraphs 1-97 and 115-152, and further state as follows:

153. At all times relevant, FL DOC was responsible for maintaining constitutional and professional standards of medical care to be delivered to FDOC inmates, where the standards included, but were not limited to creating and maintaining rules relating to the management structure of the health care system and the provision of health care services to inmates, health care policies, health care plans, quality management systems and procedures, health service bulletins, and treatment protocols.

154. At all times material, the agents and contracted workers of FL DOC who provided health care services to Mr. Williams breached their duty to Mr. Williams through its custom, policy or practice rising to the level of deliberate indifference by utilizing an antiquated and inadequate Chest Pain Protocol that omitted and failed to incorporate laboratory exam results that tested for elevated troponin levels. Chest Pain Protocols incorporating troponin measurements is a standard regularly used to determine whether myocardial injury has occurred in the cardiac care regimen.

155. Mr. Williams had repeated chest pain and a medical history of health factors that indicated he was high risk for a heart attack. Following his Lexiscan Nuclear Stress Test which was performed at FL DOC, RMC facility, FL DOC, through its agents, and contractors, delayed and thereby denied urgent follow-up medical care needed to evaluate, diagnose and treat Mr. Williams for coronary artery disease.

156. FL DOC contracted with Centurion to manage and operate a comprehensive health care delivery system for the Florida Department of Corrections. FL DOC is responsible for the actions of Centurion and its designated agents and healthcare subcontractors.

157. Centurion subcontracted with JCC and its agent, Dr. Salman, and MHN and its agent, Dr. Pedroza to provide health care services to Mr. Williams.

158. At all times material, Dr. Salman was acting under color of law on behalf of FL DOC to perform a medical function traditionally within the exclusive prerogative of the State of Florida for Department of Corrections inmates.

159. Dr. Salman's actions were the proximate cause or significantly contributed to Mr. Williams' death by heart attack. Dr. Salman's acts and omissions in Counts I (one) and VII (seven) of the Complaint are incorporated by reference as if fully enunciated.

160. At all times material, Dr. Pedroza was acting under color of law on behalf of FL DOC to perform a medical function traditionally within the exclusive prerogative of the state of Florida for Department of Corrections inmates.

161. Dr. Pedroza's actions were the proximate cause or significantly contributed to Mr. Williams' death by heart attack. Dr. Pedroza's acts and omissions in Counts III (three) and VIII (eight) of the Complaint are incorporated by reference as if fully enunciated.

162. On March 24, 2017, Mr. Williams was evaluated and treated pursuant to FL DOC's Chest Pain Protocol, which did not include a blood testing to determine troponin levels that would indicate whether Mr. Williams was having, or had recently experienced a heart attack.

163. Plaintiff had a constitutionally protected right or privilege under 42 U.S.C. §1983 from FL DOC to be afforded reasonable medical care.

164. At all times relevant, FL DOC violated Plaintiff's constitutional rights through use of the Chest Pain Protocol custom, policy or practice of:

    a. Deliberately delaying diagnosis of, and consequently treatment for, patients with serious medical needs of cardiac care beyond that which FL DOC facilities can adequately and safely handle in order to avoid and circumvent a requirement of transporting patients to non-governmental agency hospital facilities for costly treatment.
    b. Utilizing a mandatory, inadequate and antiquated Chest Pain Protocol, that does not mandate a basic testing for troponin levels to determine whether a patient is experiencing, or has recently experienced, a heart attack.
    c. Denying urgent and necessary medical treatment for serious medical needs related to chest pain until the patient has reached the direst emergency medical condition and medical instability.
    d. Providing inadequate medical care to patients with chest pain, even when the chest pain protocol (although inadequate) indicates, or does not rule out, that the patient is experiencing a myocardial infarction.

165. At all times relevant, FL DOC failed to establish and maintain a system of ready access to adequate medical care by delaying and denying evaluation and treatment for serious medical needs for patients in cardiac distress.

166. At all times material, the agents, employees and contracted workers of FL DOC who provided health care services to Mr. Williams breached their duty to Mr. Williams through its custom, policy or practice rising to the level of deliberate indifference by utilizing an antiquated and inadequate Chest Pain Protocol that omitted and failed to incorporate laboratory exam results that tested for elevated troponin levels. Chest Pain

Protocols incorporating troponin measurements is a standard regularly used to determine whether myocardial injury has occurred in the cardiac care regimen.

167. At all times material, the agents, or contracted workers of FL DOC who provided health care services to Mr. Williams violated his constitutional rights through its use of a custom, policy or practice rising to the level of deliberate indifference by failing to have a procedure that facilitated laboratory testing for troponin levels as a part of the Cardiac Care regimen.

168. As a direct and proximate consequence of the FL DOC's custom, policy and practice, in violation of the Eighth Amendment to the United States Constitution, rising to the level of deliberate indifference, Mr. Williams not only died, but sustained significant pain and suffering prior to his death.

169. As a direct and proximate result of FL DOC's violation of Mr. Williams' constitutional rights, Plaintiff, Barbara Scayles, on behalf of herself and the Estate of Ulysses G. Williams has suffered the following damages: loss of net accumulations; loss of support and services, loss of companionship and protection; mental pain and suffering, estate administration, financial assessments and legal expenses for the present action and funeral and burial expenses.

170. As a direct and proximate result of FL DOC's violation of Mr. Williams' constitutional rights, Plaintiffs, Julie McAfee on behalf of A███ W████, a minor; A███ W████ a legal minor; Nicole Berrios, on behalf of P████ B████, a minor, has suffered, and will suffer in the future, the following damages: loss of support and services, loss of companionship and protection, mental pain and suffering and loss of parental companionship, instruction, and guidance.

**WHEREFORE**, the Plaintiffs demand judgment against Defendant FL DOC for compensatory damages, costs of suit and reasonable attorney's fees pursuant to 42 U.S.C. §1988, trial by jury as to all issues so triable and such other relief as this Honorable Court may deem just and appropriate.

**DATE:** February 18, 2020.

Respectfully Submitted,
s/ Kevin R. Anderson
Kevin R. Anderson, Esq.
Florida Bar No.: 0044857
andewelch@andersonandwelch.com
Anderson & Welch, LLC
500 S. Australian Ave., 6th Flr.
West Palm Beach, FL 33401-6237
Telephone: 561-832-3386
Facsimile: 561-820-4867
*Attorney for the Plaintiffs*

## SERVICE LIST

*Barbara Scayles, as Personal Representative of the Estate of Ulysses G. Williams, et al., vs.*
*Mark S. Inch, Secretary of Florida Department of Corrections, et al.*
**United States District Court, Middle District of Florida**
**Case No 3:19-cv-1311-J-34PDB**

Kevin R. Anderson, Esq.
Florida Bar No. 0044857
Anderson & Welch, LLC
andewelch@andersonandwelch.com
andewelch@gmail.com
500 S. Australian Ave., 6th Floor
West Palm Beach, FL 33401-6237
Telephone: 561-832-3386
Facsimile: 561-820-4867

Mark S. Inch, Secretary of
Florida Department of Corrections
501 S. Calhoun St
Tallahassee, FL 32399-6505
Telephone: 850-717-3605

Centurion of Florida, LLC
Registered Agent:
CT Corporation System
1200 South Pine Island Road
Plantation, FL 33324

MHM Health Professionals, LLC
Registered Agent:
CT Corporation System
1200 South Pine Island Road
Plantation, FL 33324

Waddah Salman, MD
Jacksonville Cardiovascular Center, PL
6444 Beach Boulevard
Jacksonville, FL 32216

Jacksonville Cardiovascular Center, PL
Registered Agent Hala Salman
6444 Beach Boulevard
Jacksonville, FL 32216

Gerardo Antonio Pedroza Sierra, MD
1114 State Road 20, Suite 300
Interlachen, FL 32148