United States District Court
Middle District of Florida
Jacksonville Division

BARBARA SCAYLES, AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF
ULYSSES G. WILLIAMS, ET AL.,

*Plaintiffs*,

v.                                    No. 3:19-cv-1311-MMH-PDB

MARK S. INCH, SECRETARY OF
THE FLORIDA DEPARTMENT OF
CORRECTIONS, ET AL.,

*Defendants.*

---

## Report and Recommendation

Following the death of inmate Ulysses Williams, his estate's personal representative and others filed this lawsuit for wrongful death and deliberate indifference to his serious medical needs. Doc. 43.

Before the Court is a motion to enforce a settlement agreement by two of six defendants—Waddah Salman, M.D., and Jacksonville Cardiovascular Center, P.L. ("JCC")—and a response opposing the motion by the plaintiffs. Doc. 49 (motion), Doc. 51 (response), Doc. 65 (corrected motion).

To permit time for all parties to participate in a settlement conference with the Honorable Monte Richardson, the Court stayed and administratively closed the case. Doc. 69. Following notification that the parties failed to settle and the motion is ripe for review, Docs. 75–78, the Court lifted the stay and

directed the clerk to administratively reopen the case, Doc. 79.[1] The clerk reopened the case on April 5, 2021. No case management report has been filed.

Also ripe for review but not referred are motions to dismiss by the other defendants—Centurion of Florida, LLC ("Centurion"), Doc. 45; MHM Health Professionals, LLC ("MHM"), Doc. 46; Gerardo Pedroza-Sierra, M.D., Doc. 47; and Mark Inch in his capacity as the Secretary of the Florida Department of Corrections ("FDOC"), Doc. 48—and responses opposing the motions, Docs. 53, 54, 58, 59. A decision on the motion to enforce the settlement agreement will affect the motions to dismiss if the Court permits the plaintiffs to amend their pleading to re-assert claims against Dr. Salman and JCC.

## Allegations

Secretary Inch is responsible for providing medical care to inmates. Doc. 43 ¶ 8. FDOC contracted with Centurion to provide medical care to inmates, and Centurion subcontracted with JCC and MHM to provide medical care to inmates. Doc. 43 ¶¶ 9, 10, 12. Dr. Salman was an agent of JCC, and Dr. Pedroza was an agent of MHM. Doc. 43 ¶¶ 11, 13.

Mr. Williams was an inmate at FDOC's Reception and Medical Center. Doc. 43 ¶ 4. He was obese and had diabetes, hypertension, and high cholesterol. Doc. 43 ¶ 33. According to the plaintiffs, he died from a heart attack because of negligence and deliberate indifference. Doc. 43 ¶¶ 69, 70, 79, 80, 89, 90, 96,

---

[1]In their notice, Dr. Salman and JCC state, "Due to the impasse at the Settlement Conference, Defendants would request that a continuation hearing on [the motion to enforce a settlement agreement] be scheduled at a time convenient for the parties and this Court, so that a decision can be reached on the issue prior to the commencement of further action in this case." Doc. 75 at 1. Because the undersigned concluded a hearing on the motion rather than continue it, *see generally* Doc. 63, the undersigned construes this statement not as a request to continue the hearing but as a request to decide the motion.

97, 104, 126.

## Evidence

The undersigned scheduled an evidentiary hearing on the motion to enforce a settlement agreement. Doc. 61. At the hearing, neither side offered any evidence.[2] Doc. 63. Instead, both sides stipulated the Court can rely on exhibits to the motion and the response opposing the motion, which are email and letter communications between counsel between February and July 2020 and two draft written settlement agreements.[3] Docs. 51-1; 65-1–65-4, 65-6–65-8. Dr. Salman and JCC also rely on three "memos to file" prepared by their lawyer based on oral conversations with the plaintiffs' lawyer in May 2020. Doc. 65-5. The plaintiffs stipulate the Court can consider the "memos to file" but dispute they substantiate "what was said, meant or agreed to" by the

---

[2]No one has ordered a transcript of the hearing. Information for ordering a transcript can be obtained from Angela Loeschen, the courtroom deputy for the undersigned.

[3]Under Federal Rule of Evidence 408, evidence of a compromise of a disputed claim or conduct or a statement made during compromise negotiations about a disputed claim is inadmissible "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408(a). But a "court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." Fed. R. Evid. 408(b).

"Perhaps the largest group of [Rule 408 'another purpose'] precedents involves the use of compromise evidence where the compromise agreement is the basis for the claim rather than circumstantial evidence of the validity of the claim being compromised." 23 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 5314 (2d. ed. 2020). "For example, if suit is brought for breach of a settlement contract, Rule 408 does not prevent the plaintiff from proving the agreement." *Id.*

Here, under the "another purpose" exception, the Court can consider statements made during compromise negotiations to decide the motion to enforce a settlement agreement. *See* Fed. R. Evid. 408(b) (quoted). Neither side contends otherwise; to the contrary, both sides present statements made during compromise negotiations to support their respective positions. *See generally* Docs. 51, 51-1, 65, 65-1–65-8.

parties. Doc. 51 at 5.

The motion raises three questions. First, do the facts establish that, fourteen hours after the plaintiffs filed the amended complaint, the plaintiffs, Dr. Salman, and JCC reached an enforceable settlement agreement under which the plaintiffs would not pursue claims against Dr. Salman and JCC but would retain the right to pursue vicarious liability claims against Centurion and FDOC based on Dr. Salman's and JCC's actions? Second, do the facts establish that, eleven weeks after the plaintiffs filed the amended complaint, the plaintiffs, Dr. Salman, and JCC reached a second enforceable settlement agreement under which the plaintiffs would dismiss the claims against Dr. Salman and JCC and the vicarious liability claims against Centurion and FDOC based on their actions? Third, if no settlement agreement exists, how should the case proceed?

Because whether an enforceable settlement agreement exists depends on the language used, communications are stated verbatim.

On **June 6, 2019**, the plaintiffs notified Dr. Salman and JCC of their intent to sue them for medical negligence and wrongful death. Doc. 51 at 1; Doc. 65 at 2. *See generally* Fla. Stat. § 766.106 (pre-suit screening process for medical negligence claims).

Five months later, on **November 8, 2019**, the plaintiffs filed the original complaint, suing only Secretary Inch. Doc. 1.

The next month, on **December 20, 2019**, after engaging in discovery and settlement negotiations, Dr. Salman and JCC denied liability. Doc. 43 ¶ 28; Doc. 51 at 1.

4

The remaining events occur in 2020. The times the papers were filed are from the CM/ECF database.

Two months later, on **February 5**, the lawyer for Dr. Salman and for JCC twice emailed the plaintiffs' lawyer, asking the plaintiffs' lawyer to call him because he had had an opportunity to speak with his clients. Doc. 65-1. Later that day, he emailed the plaintiffs' lawyer:

> As we were just discussing, my client is willing to make the following final offer:
>
> My client, JCC, Dr. Salman and their agents are willing to offer ■[4] for a complete and final settlement of all claims that arise out of the claims asserted in Claimant's Notice of Intent against Dr. Salman and JCC that were brought or could have been brought against Dr. Salman and or JCC on behalf of Claimant. This includes vicarious liability claims against Centurion or DOC that may have been alleged based upon the actions of Dr. Salman or JCC. As will be more fully set out in a release, no other claims against any other prospective defendant are contemplated with this settlement.
>
> …
>
> This offer is being made with the understanding that you will recommend the same to your client.

Doc. 51-1 at 2; Doc. 65-1 at 1.

Two days later, on **February 7**, the plaintiffs' lawyer emailed the lawyer for Dr. Salman and for JCC:

> We have attempted to respond to you by telephone since your offer of ■ was made to Mr. Williams' personal representative, his parents and survivors. The terms of your offer included a release of claims against

---

[4]Amounts in the communications are redacted from the documents filed on the public docket (except page 11 of Doc. 51-1) but are unredacted in sealed filings. *See* Doc. S66-1 (unredacted emails from February 18 and May 5). To decide the motion to enforce a settlement agreement, knowing the exact amounts is unnecessary.

Centurion or FDOC. My clients are inclined to accept the offer; however, the **acceptance would result in a complete and final settlement of all claims by Mr. Williams' estate, his parents and the survivors as to Dr. Salman and JCC.** The release would be devoid of language regarding any other defendant. In addition, Dr. Salman would remain subject to discovery deposition and utilization as a witness in the case.

I am writing because we can not [sic] seem to catch each other by telephone. If we are going to resolve our potential claim as to Dr. Salman and JCC we need to begin drafting and considering the release and confidentiality agreement next week. There really is not much time left for further discussion.

Doc. 51-1 at 3 (emphasis in original); Doc. 65-2 (emphasis in original).

The record includes no communications until February 18, although Dr. Salman and JCC state in their motion that the lawyers spoke on the telephone on **February 13** and the lawyer for Dr. Salman and for JCC stated he would confirm with them whether the new terms offered by the plaintiffs are acceptable. Doc. 65 at 5. In the response to the motion, the plaintiffs do not dispute this communication occurred. *See generally* Doc. 51.

On **February 18**, at **1:54 a.m.**, the plaintiffs filed the amended complaint. Doc. 7. They added five defendants—including Dr. Salman and JCC—and brought ten claims: wrongful death against Dr. Salman (count one); vicarious liability against JCC for Dr. Salman's actions (count two); wrongful death against Dr. Pedroza (count three); vicarious liability against MHM for Dr. Pedroza's actions (count four); wrongful death against Centurion for Dr. Salman's, Dr. Pedroza's, JCC's, and MHM's actions (count five); wrongful death against Secretary Inch for Dr. Salman's, Dr. Pedroza's, JCC's, and MHM's actions (count six); deliberate indifference against Dr. Salman (count seven); deliberate indifference against Dr. Pedroza (count eight); deliberate indifference against Centurion (count nine); and deliberate indifference

against Secretary Inch (count ten). Doc. 7-6.

Fourteen hours later, at **4:23 p.m.**, the lawyer for Dr. Salman and for JCC emailed the plaintiffs' lawyer:

> This is to confirm that we have settlement of all claims against Dr. Salman and JCC for ▮. We will prepare a release. This release will include language that this settlement is to remain confidential and no claims that the Plaintiff may have as to any other defendants are being released. Dr. Salman and JCC will be dismissed with prejudice from any lawsuit being brought by the Plaintiff.
>
> Please send me a w-9 for your firm and let me know how the settlement check is to be made out. In the meantime, I will draft a release for your consideration. …

Doc. 51-1 at 4; Doc. 65-3 at 1.

The next day, on **February 19**, the plaintiffs' lawyer emailed the lawyer for Dr. Salman and for JCC:

> Kevin brought me up to speed on your conversation yesterday. On our end, he re-approached Mr. Williams' family regarding the *pre-suit* settlement offer from February 5th. As he advised, the law suit [sic] was filed on February 18th. Right now, our clients' emotions are high because they read the complaint. We will need a few days. We can get back with you at the end of this week, but as things stand today, I am not certain that we will have a proposed resolution by then. We will keep in touch on the movements towards settlements on our end. Of course, we are working towards resolving and ending your clients' participation as defendants in this litigation, for an amount as close to the pre-suit figure as possible.

Doc. 51-1 at 5; Doc. 65-3 at 1 (emphasis in original).

Two weeks later, on **March 3**, the plaintiffs' lawyer again emailed the lawyer for Dr. Salman and for JCC:

> Our clients have settled somewhat. We dissected the claims and each

alleged tort feasor's [sic] contributions. The family believes that Dr. Salman, as a cardiologist, was particularly experienced to have taken necessary steps to save their son's life. They understand Dr. Pedroza's role too. I will not go into their thoughts concerning Dr. Pedroza at this time. We knew we were going to run into problems after the complaint was filed. That's precisely why we were trying to reach a pre-suit resolution. The survivors clearly comprehend the nature of the claim. The best I can convey is that Dr. Salman and JCC are now being considered within the context of the totality of the circumstances. We do, however, anticipate the possibility of settlement of claims against your clients. … [T]his is going to have to be done before commencement of painful discovery, as the survivors want to fully participate in same.

Doc. 51-1 at 6.

The record includes no communications for the next two months.

Without record evidence, Dr. Salman and JCC state their lawyer was drafting a motion to dismiss the amended complaint and enforce the asserted settlement agreement completed through his February 18 email when, on **May 4**, their lawyer, the plaintiffs' lawyer, and Centurion's lawyer participated in a telephone conference to negotiate a global settlement. Doc. 65 at 7. In the response to the motion, the plaintiffs do not dispute that the lawyer for Dr. Salman and for JCC was drafting a motion or that the conference occurred. *See generally* Doc. 51.

The next day, on **May 5**, at **12:01 p.m.**, the plaintiffs' lawyer emailed a letter to the lawyer for Dr. Salman and for JCC:

I am writing to convey an offer of █ to settle all outstanding claims in the *Estate of Ulysses Williams, et al.*, against [JCC] and Dr. … Salman.

Acceptance of the above offer would cover both defendant parties and **result in a complete and final settlement of all claims by Mr. Williams' estate, his parents, and the survivors as to Dr. Salman and JCC**. The terms of any release would be devoid of language regarding any other defendants. Finally, Dr. Salman would remain

8

subject to discovery deposition and utilization as a witness in the case per the Federal Rules of Civil Procedure. …

Doc. 51-1 at 7–8, 11, 14 (emphasis in original); Doc. 65-4 (emphasis in original); Doc. 65-6 at 1. The amount in this letter is higher than the amount in the February 2020 emails. Doc. S66-1.

On the same day, the lawyer for Dr. Salman and for JCC recorded three "memos to file." The first one states:

On this date, I received an email from [the plaintiffs' lawyer] with a Proposal for Settlement. He called me at 1:20 p.m. and asked me if I received it. I told him that I did receive it but have not been able to speak with my client about it yet.

I pointed out to him that in paragraph five and six of Plaintiff's Complaint they have allegations as to Centurion and [FDOC] as to 768.28 as to the allegations based upon the acts of both [FDOC] and Salman and my question to him was are you extinguishing your claims against Centurion and [FDOC] with regards to the actions of Salman.

He said, no, he is not but his complete target then changes and will only be going after Dr. Pedroza.

He said that if we are in agreement, then he can file a Notice of Settlement saying that we have settled the case and that they will do a voluntary Dismissal With Prejudice.

I told him that I would speak with my client and get back to him.

Doc. 65-5 at 2. The second one states:

On Tuesday, May 5 … at 1:45 p.m., I called [the plaintiffs' lawyer] after my previous conversation with him as I was reflecting on what we talked about. I was a little confused in that I thought he told me during the last conversation, a little while ago, that he was not going to pursue anything as to Salman period, end of story, that everything focuses on Pedroza.

I called him back and asked him about specifically paragraphs

five and six or Counts V and VI of the Complaint. Both of these allege that Centurion and [FDOC] are negligent based upon the actions of Salman and Pedroza.

[The plaintiffs' counsel] clarified to me that he will not be pursuing the allegations against Centurion and [FDOC] based upon the actions of Salman and JCC based upon our settlement agreement.

Specifically, we looked at paragraph 105[5] and said that he will not be pursuing the claim against Salman in that paragraph. His intentions are to only be moving forward with Pedroza.

He also kind of mentioned some of the arguments that he would try to make is that Salman had no control, [FDOC] had control, etc.

Doc. 65-5 at4. The third one states:

On Tuesday, May 5 … at 2:35 p.m., I gave [the plaintiffs' counsel] a call to further clarify the meaning of the settlement. I read him an email that I forward [sic] to him which speaks to extinguishing of claims in Counts V and VI with respect to Dr. Salman. He was in agreement with the language and I told him that I would send same to him.

He also said that he will then work on a Notice of Settlement to file with the court today.

So, that is where we left it.

Doc. 65-5 at 6.

Four minutes after the telephone conversation summarized in the last "memo to file," at **2:39 p.m.**, the lawyer for Dr. Salman and for JCC emailed the plaintiffs' lawyer:

Thank you for the attached letter. In your letter, you state that:

---

[5]Paragraph 105 of the amended complaint is under the wrongful death claim against Centurion (count five) and states, "As a direct and proximate result of the acts of Centurion, acting by and through Dr. Salman and Dr. Pedroza, Mr. Williams suffered a myocardial infraction on March 24, 2017, at the [FDOC] RMC facility, and died." Doc. 7-6 ¶ 105.

> "I am writing to convey an offer of █ to settle all
> outstanding claims in the Estate of Ulysses Williams, et.
> al. against Jacksonville Cardiovascular Center (JCC) and
> Dr. Salman."

> In speaking with you a few moments ago, you clarified that "all
> outstanding claims" against JCC and Dr. Salman includes the
> allegations made regarding Dr. Salman/JCC in counts 5 and 6 of
> Plaintiff's Amended Complaint. In other words, based on an acceptance
> by JCC/Salman of Plaintiff's [sic] offer to settle, Plaintiff[s] will no longer
> prosecute the allegations made in Count 5 and 6 with respect to the
> alleged acts or omissions of Dr. Salman/JCC in addition to the other
> counts directed to Salman and JCC.

> Please confirm in writing.

Doc. 51-1 at 9; Doc. 65-6 at 1.

Eighteen minutes later, at **2:57 p.m.**, the plaintiffs' lawyer emailed the
lawyer for Dr. Salman and for JCC:

> In response to your email concerning settlement, Plaintiffs will not seek
> liability against, nor damages from, JCC and Dr. Salman for their acts
> or omissions alleged in counts 5 through 6 and the additional counts
> alleged against them in the Amended Complaint, upon acceptance of the
> settlement offer by each party defendant. The terms of this settlement
> pertain only to JCC and Dr. Salman.

Doc. 51-1 at 12; Doc. 65-6 at 3.

Twenty-eight minutes later, at **3:25 p.m.**, the lawyer for Dr. Salman and
for JCC emailed the plaintiffs' lawyer:

> This is to confirm that we have a settlement consistent with the terms
> of your letter attached to the emails below. I will obtain a check from my
> client for █ in full settlement of this case as to JCC and Salman.

> Please let me know how you would like the check made and please
> provide me a w-9. We will draft a release for your consideration. It is my
> understanding that in light of our settlement, you will file today a Notice
> of Settlement indicating that the Plaintiff will dismiss the case only as

> to Salman and JCC with prejudice upon an exchange of the settlement
> funds and the executed release. …

Doc. 51-1 at 13; Doc. 65-6 at 4. (Which letter this email references is unclear.
The only letter in this email chain offered for consideration is the letter from
the plaintiffs' lawyer attached to the May 5, 12:01 p.m., email. *See* Doc. 65-4.)

A few hours later (and the next day to correct technical deficiencies), the
plaintiffs notified the Court they, Dr. Salman, and JCC had settled the dispute
and would be filing a joint stipulation of dismissal regarding Dr. Salman and
JCC within twenty days. Docs. 26, 28. Dr. Salman and JCC asked the Court to
"retroactively" give them until May 5 to respond to the amended complaint or
settle. Docs. 32, 33. They explained they and the plaintiffs had "reached a final
settlement in this case" rendering a response to the amended complaint moot.
Doc. 32 at 2.

On **May 7**, this Court ordered the plaintiffs, Dr. Salman, and JCC "to
file a joint motion for dismissal or other appropriate documents to close out the
file as to the claims against" Dr. Salman and JCC by July 6, 2020. Doc. 34.

Three weeks later, on **May 29**, at **11:42 a.m.**, the lawyer for Dr. Salman
and for JCC sent a proposed release and confidentiality agreement that
included these whereas clauses:

> **WHEREAS**, the Claim includes the following causes of action in their
> entirety: Count I (One) of the attached Complaint, Count II (Two) of the
> attached Complaint, and Count VII (Seven) of the attached Complaint;
> and
>
> **WHEREAS**, the Claim also includes Count V (Five) and Count VI (Six)
> of the attached Complaint, to the extent that these claims are based on
> the alleged negligent actions of the Defendants …

Doc. 51-1 at 15–16; Doc. 65-7.

12

Later that day, at **5:19 p.m.**, the plaintiffs moved to amend the complaint without opposition from the defendants. Doc. 41. They explained that, among other things, they were deleting counts one, two, and seven "pertaining to Defendants Salman and JCC resulting from a settlement agreement for those claims." Doc. 41 at 2. In the proposed second amended complaint, they name all six defendants but drop the claims against Dr. Salman and JCC and bring only six claims: wrongful death against Dr. Pedroza (count one); vicarious liability against MHM for Dr. Pedroza's actions (count two); wrongful death against Centurion for Dr. Salman's, Dr. Pedroza's, JCC's and MHM's actions (count three); wrongful death against Secretary Inch for Dr. Salman's, Dr. Pedroza's, JCC's and MHM's actions (count four); deliberate indifference against Dr. Pedroza (count five); and deliberate indifference against Centurion (count six). Doc. 41-1.

Later that hour, at **5:56 p.m.**, the plaintiffs' lawyer emailed the lawyer for Dr. Salman and for JCC:

> Thank you for the draft agreement and release. Upon review of the draft, I have edited and proposed several changes, mostly to reflect the existing claims for defendants who remain a part of the litigation. Our intent was to release Dr. Salman and JCC from liability and damages asserted or pursued by the Williams' estate. Therefore, we have taken the editorial action which excludes the remaining defendants from our agreement. Finally, this is a settlement agreement; therefore, I added the word "agreement" to the document, and also you and your clients' [sic] as signatories. Thank you, for including my client and I as signatories in the initial draft.

Doc. 51-1 at 19. The plaintiffs' lawyer proposed these revisions to one of the whereas clauses:

13

> **WHEREAS,–** the intent of the Plaintiff is to absolve **WADDAH SALMAN, M.D.,** and **JACKSONVILLE CARDIOVASCULAR CENTER, P.L.** for the cause of action above, and not to hold harmless or release any additional defendant named in the above-referenced action of liability~~the Claim also includes Count V (Five) and Count VI (Six) of the attached Complaint, to the extent that these claims are based on the alleged negligent actions of the Defendants,~~:

Doc. 51-1 at 20; Doc. 65-8 at 1. The plaintiffs' lawyer also proposed these additions:

> complete compromise and settlement, accord and satisfaction and payment thereof, ~~and therefore~~but only to the extent that this release does not absolve the remaining defendants of liability. Nothing in the foregoing agreement and release shall create privity between the Plaintiff, JACKSONVILLE CARDIOVASCULAR CENTER, P.L., WADDAH SALMAN, M.D., and remaining defendants concerning pursuit of liability and damages for the remaining claims. **Moreover, the parties agree that each party shall bear their own attorney's fees and costs.**
>
> JACKSONVILLE CARDIOVASCULAR CENTER, P.L., and WADDAH SALMAN, M.D., covenant that MAG MUTUAL INSURANCE COMPANY does not insure any defendant, other than JACKSONVILLE CARDIOVASCULAR CENTER, P.L., and WADDAH SALMAN, M.D., in the civil case arising from the attached Complaint.
>
> PLAINTIFF releases only JACKSONVILLE CARDIOVASCULAR CENTER, P.L., and WADDAH SALMAN, M.D., from their specific liability asserted in Count I (One) of the attached Complaint, Count II (Two) of the attached Complaint, and Count VII (Seven) of the attached Complaint, but not any remaining defendant from liability because of any act, actions or omissions claimed by Plaintiff or any remaining defendant arising from JACKSONVILLE CARDIOVASCULAR CENTER, P.L., and WADDAH SALMAN, M.D.'s actions.

Doc. 51-1 at 21; Doc. 65-8 at 2.

On **June 2**, the Court granted the plaintiffs' motion for leave to amend the complaint, Doc. 42, and the clerk filed the proposed second amended complaint as the operative pleading, Doc. 43.

On **June 18**, the plaintiffs' lawyer emailed the lawyer for Dr. Salman and for JCC a letter:

> I am writing to memorialize this morning's conversation with your office. We have not yet received the draft for ▮ the signed settlement agreement and release. Our settlement pertained to claims *by* the Williams' Estate, et. al., *against* Dr. Salman and JCC. The terms pertain

14

only to Dr. Salman and JCC. There was nothing in our emails, correspondence or phone communication that included abandonment of claims against the remaining defendants or collateral liability that may arise between your client and those remaining parties. This was outside the scope of our agreement.

The case has now moved forward with the remaining defendants and anticipation of settlement between our clients, respectively. We need to know whether your intention is to attempt to vacate our settlement, or tender payment and execute the edited release against Dr. Salman and JCC. Please advise accordingly.

Doc. 51-1 at 24–25 (emphasis in original).

The following week, on **June 24**, the plaintiffs' lawyer emailed the lawyer for Dr. Salman and for JCC another letter:

Our office has given your client sufficient time to execute the settlement agreement. We are preparing the motion for the district court to enforce the agreement or, in the alternative, amend the complaint to reintegrate Dr. Salman and [JCC] into the litigation.

Doc. 51-1 at 26–27.

Two weeks later, on **July 6**, at **11:37 a.m.**, the plaintiffs' lawyer emailed the lawyer for Dr. Salman and for JCC another letter:

Reference our phone call to your office this morning. We initiated the call as over 2 (two) weeks had passed since our correspondence and telephone discussion of June 18th concerning settlement. We are rather disturbed by your office's unexpected insistence upon protecting the co-defendants as neither the decedent's estate or our office ever remotely agreed or conceded to extinguish potential cross claim liability between any party in this case. ***To reiterate our position, the Plaintiff did not agree to abandon claims against the remaining defendants or to eliminate liability that may arise between your clients and any party by settling with your clients.*** There is not privity of contractual agreement or legal relationship between the decedent's estate and the defendants in this regard. We have always made this abundantly clear.

> Your office's failure to execute the settlement agreement and tender payment or maintain communication signals an attempt to modify or vacate our settlement agreement between the decedent's estate, Dr. Salman and JCC.

Doc. 51-1 at 29 (emphasis in original).

Four hours later, at **4:23 p.m.**, Dr. Salman and JCC filed the current motion to enforce a settlement agreement. Doc. 49. They filed a corrected version thereafter only to add a complete exhibit. Docs. 62, 63, 65. Both the motion and the corrected motion are docketed as pending.

## Motion

Dr. Salman and JCC contend there are two enforceable settlement agreements, one reached in February 2020 and one reached in May 2020.

Dr. Salman and JCC contend (1) the February 5 email by their lawyer is an initial offer including the essential term that the amount settles both claims against them and vicarious liability claims against Centurion and FDOC; (2) the February 7 email by the plaintiffs' lawyer is a rejection of the initial offer and a counteroffer with the new essential term that the plaintiffs retain the ability to pursue vicarious liability claims against Centurion and FDOC based on Dr. Salman's and JCC's actions; and (3) the February 18, 4:23 p.m., email by their lawyer is an acceptance of that counteroffer. Doc. 65 at 5. According to Dr. Salman and JCC, "All essential terms of the agreement, including the monetary consideration, the exact claims being released, and the confidential nature of the agreement, were included in the acceptance email, and mirrored the terms of the … counteroffer. Only after the agreement had been reached did the Plaintiffs get cold feet and attempt to renege on the settlement." Doc. 65 at 6.

Referencing the later May 5, 12:01 p.m., letter from the plaintiffs' lawyer, Doc. 65-4, Dr. Salman and JCC continue, "As a valid contract already existed, this new counteroffer was improper unless it included additional consideration[.] [T]his time, it was Defendants' belief that further settlement discussions would ultimately result in the extinguishment of the related vicarious liability claims against the remaining defendants, therefore in the interest of including this additional consideration in the terms of the agreement, Defendants pursued these additional discussions." Doc. 65 at 7. They contend, "Ultimately, in lieu of Defendants filing a Motion to Dismiss Plaintiff's [sic] Amended Complaint and Enforce Settlement, the parties reached a second settlement agreement on May 5, 2020, under new terms." Doc. 65 at 7.

According to Dr. Salman and JCC, the May 5 communications form a "valid settlement agreement … multiple times" under which they would increase the amount to the plaintiffs and the plaintiffs would dismiss the claims against them and the vicarious liability claims against Centurion and FDOC based on their actions. Doc. 65 at 8–9. Dr. Salman and JCC complain:

> Once again, after painstakingly working to clearly reach an agreement regarding the terms of the settlement, and receiving confirmation of the terms as understood by Defendants, which included an increase in the settlement amount as consideration for the dismissal of additional claims, Plaintiffs once again attempted to renege on the agreement and change the terms after the fact. Only after this agreement had been reached did Plaintiffs once again attempt to alter the terms of the agreement by editing the Settlement and Release Agreement to state that they would not extinguish the vicarious liability claims alleged in Counts V and VI based on the alleged negligent acts of Defendants.

Doc. 65 at 9. Dr. Salman and JCC conclude, "Based on the principles of contract law, there was a valid and enforceable agreement reached on May 5 … which

included dismissal of the allegations against Centurion and FDOC as they related to the alleged negligence of Defendants." Doc. 65 at 10.

Dr. Salman and JCC ask the Court to "enforce the valid settlement agreement that was reached between the parties during both the pre[-]suit period and during the pendency of this lawsuit, and enter an Order dismissing Count III and Count IV of Plaintiffs' Second Amended Complaint as they relate to Defendants' alleged negligence with prejudice[.]"[6] Doc. 65 at 10.

## Response

The plaintiffs dispute they, Dr. Salman, and JCC reached an enforceable settlement agreement in February 2020. Doc. 51 at 5. They emphasize that the lawyer for Dr. Salman and for JCC never responded to their lawyer's February 7 email requesting "clarification and correction of his understanding of the disputed terms." Doc. 51 at 5. They add they have "no privity of contractual agreement or legal relationship with JCC or Salman to absolve their liability for claims arising from the remaining defendants' actions between them." Doc. 51 at 3.

The plaintiffs argue that to the extent they, Dr. Salman, and JCC reached an enforceable agreement in May 2020, the agreement included the essential term that the vicarious liability claims against Centurion and FDOC based on Dr. Salman's and JCC's actions remain in the case. Doc. 51 at 7. They emphasize, "[T]here is absolutely *no demand, offer or written communiqué* whatsoever between JCC, Salman and the Plaintiff bargaining for settlement based upon a monetary increase to absolve cross claims or indemnification

---

[6]According to Dr. Salman and JCC, the two asserted settlement agreements contain different terms, including amounts; they do not explain how the Court can enforce both.

from negotiated settlement discussions between the parties. Opposing counsel's own unilateral file notes do not even reflect such terms." Doc. 51 at 5. They argue that a "record of an undisputable oral agreement between the parties [as asserted by Dr. Salman and JCC] is not supported by competent substantial evidence." Doc. 51 at 5.

While contending the "memos to file" do not "substantiate what was said, meant or agreed to by the Parties based upon counsel's unilateral recitation," the plaintiffs emphasize one "memo to file" states the plaintiffs' lawyer said the plaintiffs were not "extinguishing" vicarious liability claims against Centurion and FDOC for Dr. Salman's actions. Doc. 51 at 5.

The plaintiffs ask the Court to enforce a settlement agreement "devoid of terms pertaining to a release of liability and damages for any party defendants except JCC and Salman" or, if the Court determines no enforceable settlement agreement exists, permit them to file a third amended complaint that returns Dr. Salman and JCC to the action. Doc. 51 at 7–8; *see* Doc. 51 at 7 (mistakenly referencing Dr. Pedroza, not Dr. Salman). They explain the other defendants either have no objection or take no position on amendment. Doc. 51 at 8. At the hearing, the plaintiffs' lawyer represented the plaintiffs have no preference on which of the two proposed actions the Court takes.

## Law

A district court has inherent authority to enforce a settlement agreement between parties in a pending case. *Ford v. Citizens and S. Nat'l Bank, Cartersville*, 928 F.2d 1118, 1121 (11th Cir. 1991). "To that end … the district court may hold an evidentiary hearing and make factual determinations." *Id.*

A district court may enforce only a complete settlement agreement. *Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1484, 1486 (11th Cir. 1994). If a substantial factual dispute about the fact of an agreement or the terms of an agreement exists, the court must permit an evidentiary hearing. *Id.*

The law of the forum state governs the interpretation and enforceability of a settlement agreement. *In re Chira*, 567 F.3d 1307, 1311 (11th Cir. 2009). Under Florida law, a settlement agreement is interpreted and governed by contract law. *Williams v. Ingram*, 605 So. 2d 890, 893 (Fla. 1st DCA 1992). Absent a provision specifying the governing law, a contract other than for performing services is governed by the law of the state in which the contract was made. *Shaps v. Provident Life & Acc. Ins. Co.*, 826 So. 2d 250, 254 n.3 (Fla. 2002).

The plaintiffs, Dr. Salman, and JCC agree Florida law governs the dispute. *See* Doc. 51 at 6–7; Doc. 65 at 3–5.

In both Florida courts and federal courts, "settlements are highly favored and will be enforced whenever possible." *Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985) (citing *Pearson v. Ecological Science Corp.*, 522 F.2d 171 (5th Cir. 1975)); *accord Broadnax v. Sand Lake Cancer Ctr., P.A.*, 819 F. App'x 799, 801 (11th Cir. 2020).

To be enforceable, a settlement agreement need not be in writing (unless performance could not be completed in one year) and need not be executed by the parties (unless execution by the parties was a condition precedent to the settlement agreement). *Boyko v. Ilardi*, 613 So. 2d 103, 104 (Fla. 3d DCA 1993). An exchange of emails can create an enforceable settlement agreement. *Warrior Creek Dev., Inc. v. Cummings*, 56 So. 3d 915, 917 (Fla. 2d DCA 2011).

"[T]he question of whether a valid contract exists is a threshold question of law[.]" *Kolodziej v. Mason*, 774 F.3d 736, 740 (11th Cir. 2014) (citing *Acumen Constr., Inc. v. Neher*, 616 So. 2d 98, 99 (Fla. 2d DCA 1993)).

The party seeking to enforce a settlement agreement must establish the existence of an enforceable contract. *CEFCO v. Odom*, 278 So. 3d 347, 352 (Fla. 1st DCA 2019). The party must prove the existence of (1) an offer, (2) an acceptance, (3) consideration, and (4) sufficient specification of the essential terms. *Kolodziej*, 774 F. 3d at 741 (citing *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004)).

An offer is a "proposal to do a thing or pay an amount, usually accompanied by an expected acceptance, counter-offer, return promise or act"; stated another way, an offer is a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Lee Cnty. v. Pierpont*, 693 So. 2d 994, 996 (Fla. 2d DCA 1997) (quoted authority omitted). An acceptance is an "agreement to be bound to the contract terms." *Leesburg Comm. Cancer Ctr. v. Leesburg Reg'l Med. Ctr.*, 972 So. 2d 203, 206 (Fla. 5th DCA 2007).

Whether a term is essential "varies widely according to the nature and complexity of each transaction and is evaluated on a case-by-case basis." *Lanza v. Damian Carpentry, Inc.*, 6 So. 3d 674, 676 (Fla. 1st DCA 2009). Still, because an acceptance is effective to create a contract only if the acceptance is absolute, unconditional, and identical with the terms of the offer, essential terms will always include "the terms specified in an offer to make a contract." *Giovo v. McDonald*, 791 So. 2d 38, 40 (Fla. 2d DCA 2001).

"Although settlement agreements are favored by the law and enforced

whenever possible, there must still be a manifestation of mutual assent as to the essential settlement terms in order for the agreement to be enforceable." *DeJour v. Coral Springs KGB, Inc.*, 293 So. 3d 502, 504 (Fla. 4th DCA 2020). The party seeking judgment based on a settlement must prove assent by the opposing party and must establish there was a meeting of the minds or mutual or reciprocal assent to certain definite propositions. *Williams*, 605 So. 2d at 893. "So long as any essential matters remain open for further consideration, there is no completed contract." *Jacksonville Port Auth. v. W.R. Johnson Enters. Inc.*, 624 So. 2d 313, 315 (Fla. 1st DCA 1993) (quoted authority omitted).

On one hand, if "the parties are continuing to negotiate … essential terms, there can be no meeting of the minds." *Jacksonville Port Auth.*, 624 So. 2d at 315. On the other hand, even if all details are not definitely fixed, "an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them." *Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 408 (Fla. 1974).

"Mutual assent is not necessarily an independent 'element' unto itself; rather, [a court] evaluate[s] the existence of assent by analyzing the parties' agreement process in terms of offer and acceptance." *Kolodziej,* 774 F.3d at 740. "A valid contract—premised on the parties' requisite willingness to contract— may be 'manifested through written or spoken words, or inferred in whole or in part from the parties' conduct.'" *Id.* (quoting *L & H Constr. Co. v. Circle Redmont, Inc.*, 55 So. 3d 630, 634 (Fla. 5th DCA 2011)).

"A trial court's finding that there was a meeting of the minds must be supported by competent substantial evidence." *Spiegel v. H. Allen Holmes, Inc.*,

834 So. 2d 295, 297 (4th DCA 2002). "Preliminary negotiations or tentative and incomplete agreements will not establish a sufficient meeting of the minds to create an enforceable settlement agreement." *Williams*, 605 So. 2d at 893.

A court uses an objective standard to determine if a contract is enforceable. *Kolodziej,* 774 F.3d at 741 (citing *Robbie*, 469 So. 2d at 1385). Under this standard, a court looks not "into the subjective minds of the parties; [rather], the law imputes an intention that corresponds with the reasonable meaning of a party's words and acts." *Id.* at 745. The agreement of the parties "is ascertained from the language used in the instrument and the objects to be accomplished[.]" *Rylander v. Sears Roebuck & Co.,* 302 So. 2d 478, 479 (Fla. 3d DCA 1974). "The making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs— not on the parties having meant the same thing but on their having said the same thing." *Robbie,* 469 So. 2d 1385 (quoted authority omitted).

## Analysis

Returning to the first question raised by the motion: Do the facts establish that the plaintiffs, Dr. Salman, and JCC reached an enforceable settlement agreement before the plaintiffs filed the amended complaint under which the plaintiffs would not pursue claims against Dr. Salman and JCC but would retain the right to pursue vicarious liability claims against Centurion and FDOC based on their actions? Applying Florida contract law, the answer is no.

The February 7 email from the plaintiffs' counsel on which Dr. Salman and JCC rely as the counteroffer they accepted with their post-pleading February 18 email reflects not a counteroffer but the state of negotiations at

that point—"pre-suit" negotiations that never ripened into an actual counteroffer. In the February 7 email, the plaintiffs' lawyer merely explains the plaintiffs are "inclined to accept" the initial offer if an essential term of the initial offer is omitted to permit them to sue Centurion and FDOC for Dr. Salman's and JCC's actions; states that if the parties are going to settle, they need to begin drafting a release and confidentiality agreement; and states there is "not much time left for further discussion." Doc. 51-1 at 3; Doc. 65-2. Read together, this language would not justify an understanding that assent without further communication concludes the deal. *See Pierpont*, 693 So. 2d at 996 (explaining the meaning of an offer).

Later events support this conclusion. The plaintiffs moved forward with filing the amended complaint naming Dr. Salman and JCC after failing to hear from the lawyer for Dr. Salman and for JCC about what the plaintiffs were inclined to consider. *See* Doc. 7. In his February 19 email, the plaintiffs' lawyer referenced only the February 5 email as the offer on the table. *See* Doc. 51-1 at 5. The lawyer for Dr. Salman and for JCC provided no response to the February 19 and March 3 emails from the plaintiffs' lawyer explaining the plaintiffs' reaction to the amended complaint, next communicated only months later and then only about a global settlement, Doc. 65 at 7, and filed no motion to enforce a settlement agreement until July 6. Doc. 49.

Returning to the second question raised by the motion: Do the facts establish the plaintiffs, Dr. Salman, and JCC reached a second enforceable settlement agreement after the plaintiffs filed the amended complaint under which the plaintiffs would dismiss the claims against Dr. Salman and JCC and the vicarious liability claims against Centurion and FDOC based on their actions? Applying Florida contract law, the answer is again no.

24

Neither side disputes that whether the plaintiffs can pursue claims against Centurion and FDOC based on Dr. Salman's and JCC's actions is an essential term. On this term, the May 2020 communications reflect no meeting of the minds. The May 5 email from the plaintiffs' lawyer is an offer to settle if the terms of any release are "devoid of language regarding any other defendants." Doc. 65-4. After conversations to clarify the term (summarized in the "memos to file"), the lawyer for Dr. Salman and for JCC asked the plaintiffs' lawyer to confirm in writing that the plaintiffs will no longer prosecute vicarious liability claims against Centurion and FDOC based on Dr. Salman's and JCC's actions. Doc. 65-6 at 1. Within eighteen minutes, rather than provide that confirmation, the plaintiffs' lawyer explained the plaintiffs would "not seek liability against, nor damages from, JCC and Dr. Salman" for their actions alleged in the vicarious liability counts against Centurion in count five and FDOC in count six but emphasized the terms "pertain only" to Dr. Salman and JCC. Doc. 51-1 at 12. The communications show one side (Dr. Salman and JCC) believed the settlement meant the plaintiffs would not pursue claims against Centurion and FDOC based on Dr. Salman's and JCC's actions, while the other side (the plaintiffs) believed the settlement meant the plaintiffs would not pursue claims against Dr. Salman and JCC based on their actions alleged in the counts against Centurion and FDOC. Without a meeting of the minds on this essential term, no enforceable settlement agreement exists.

Finally, returning to the third question raised by the motion: if no settlement agreement exists, how should the case proceed? A party ordinarily should separately move for relief rather than requesting relief in response to a motion. But in the interest of judicial economy and to get the case moving forward again without further delay, the undersigned recommends permitting the plaintiffs to re-file the amended complaint as the third amended complaint;

25

denying without prejudice the pending motions to dismiss the second amended complaint, Docs. 45–48; directing all defendants to respond to the third amended complaint; requiring the parties to submit a case management report using the new form; establishing deadlines for these actions; and entering a case management and scheduling order.

## Recommendation[7]

The undersigned recommends:

(1) **denying** Dr. Salman and JCC's motion to enforce a settlement agreement, Doc. 49, as corrected, Doc. 65;

(2) **permitting** the plaintiffs to re-file the amended complaint, Doc. 7, as the third amended complaint;

(3) **denying** without prejudice the pending motions to dismiss the second amended complaint, Docs. 45–48;

(4) **directing** all defendants to respond to the third amended complaint by a date certain;

(5) **requiring** the parties to submit a case management report using the new form by a date certain; and

---

[7]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

(6)    **entering** a case management and scheduling order.

**Entered** in Jacksonville, Florida, on April 22, 2021.

_____

PATRICIA D. BARKSDALE
_United States Magistrate Judge_

c:    The Honorable Marcia Morales Howard
      Counsel of record