UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

BARBARA SCAYLES, AS
PERSONAL REPRESENTATIVE
OF THE ESTATE OF ULYSSES G.
WILLIAMS, ET AL.,

               Plaintiffs,

v.

                                      Case No. 3:19-cv-1311-MMH-PDB

MARK S. INCH, SECRETARY OF
THE FLORIDA DEPARTMENT OF
CORRECTIONS, ET AL.,

               Defendants.

_____

## **ORDER**

### **I. Status**

     Plaintiffs Barbara Scayles, as personal representative of the estate of Ulysses G. Williams; Julie McAfee on behalf of A.W., a minor; and Nicole Berrios on behalf of P.B., a minor, (Plaintiffs) initiated this action with the assistance of counsel on November 8, 2019. See Doc. 1. Plaintiffs are proceeding on a third amended complaint (Complaint; Doc. 83). In the Complaint, Plaintiffs assert claims against the following Defendants:  (1) Mark S. Inch, Secretary of the Florida Department of Corrections (FDOC); (2) Centurion of Florida, LLC (Centurion); (3) MHM Health Professionals, LLC (MHM); (4)

Gerardo Pedroza-Sierra, M.D.; (5) Jacksonville Cardiovascular Center, P.L. (JCC); and (6) Waddah Salman, M.D. Plaintiffs contend that Defendants are liable under 42 U.S.C. § 1983 and Florida law for the death of Ulysses Williams, who died from a heart attack while an inmate of the Florida penal system. See generally Complaint. As relief, Plaintiffs request compensatory damages, costs of litigation, and reasonable attorney fees. Before the Court are Defendants' motions to dismiss. See Inch Motion (Doc. 84); Centurion Motion (Doc. 88); Pedroza Motion (Doc. 89); MHM Motion (Doc. 90); JCC Motion (Doc. 91). Plaintiffs filed responses in opposition to the motions to dismiss. See Inch Response (Doc. 85); Pedroza Response (Doc. 97); MHM Response (Doc. 98); Salman Response (Doc. 99); JCC Response (Doc. 100); Centurion Response (Doc. 101). Thus, the motions to dismiss are ripe for review.

## II. Motion to Dismiss Standard

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Nonetheless, the plaintiff must still meet some minimal pleading requirements. Jackson v.

2

BellSouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted). Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Twombly, 550 U.S. at 555 (internal quotations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." Iqbal, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine

whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

### III. Plaintiffs' Allegations

Plaintiffs assert that starting on June 30, 2015, Ulysses Williams spent approximately nine days at the Reception and Medical Center (RMC) where he underwent multiple medical evaluations. Complaint at 5. These evaluations showed that Williams was obese and had a history of type 2 diabetes and hypertension. Id. at 6. FDOC then transferred Williams to a facility in Graceville, FL, where he remained for approximately seventeen months and, at which, he received treatments for obesity, diabetes, and hypertension. Id. While at the Graceville prison, medical personnel diagnosed Williams with dyslipidemia/high cholesterol and documented in his medical records that his condition was "intermittently uncontrolled, but not imminently life threatening." Id. From August through December of 2016, Williams repeatedly complained and made requests to address chronic chest pain. Id. Over that period, Williams received more than ten medical consultations concerning chest pain. Id. Between August of 2016 and January of 2017, the Graceville facility's medical staff performed diagnostic tests on Williams, which showed

abnormal results indicating an inferior myocardial infarct. Id. According to Plaintiffs, this meant that Williams previously suffered a heart attack. Id.

On January 19, 2017, Williams' primary care physician at Graceville requested a cardiology consultation for Williams because of the on and off chest pain; history of diabetes, dyslipidemia, and hypertension; as well as Williams' complaint of shortness of breath and chest pain while exercising. Id. at 7. The primary care physician made a provisional diagnosis of chronic chest pain, possible inferior infarct, and the need for further studies to rule out coronary artery disease. Id. On February 7, 2017, the FDOC transferred Williams to RMC for a cardiology consult with Dr. Waddah Salman. Id.

Salman, who had Williams' medical records, examined Williams on February 9, 2017. Id. Salman noted during the examination that Williams was a smoker and had a family history of coronary disease. Id. Additionally, Salman's notes reflect that Williams had experienced intermittent chest pain for seven months that was "consistent with typical angina." Id. at 8. According to Plaintiffs, "Salman recommended with urgency that Mr. Williams undergo a Lexiscan Nuclear Stress Test." Id. Medical staff, with Salman overseeing them, performed the stress test on March 16, 2017. Id. The stress test results were consistent with someone who had a prior heart attack and was at high risk of a future heart attack. Id. Despite this information, Plaintiffs allege that

Salman did not order further medical attention "to coordinate urgent care for Mr. Williams or follow up with immediate heart catherization that would have located narrowing or blockages in or near Mr. Williams' heart where angioplasty (with or without stent placement) could have been performed to widen the narrowed arteries." Id. Salman did not dictate or transcribe the results of the stress test until late April of 2017, after the five-day period FDOC regulations prescribe for recording this data, and after Williams had already died. Id. at 11.

On March 24, 2017, Williams went to the urgent care at RMC "with complaints of epigastric and chest pain[.]" Id. at 8. Dr. Gerado Pedroza examined him that day and was aware of Williams' medical history and his risk factors for a heart attack. Id. at 9. However, Pedroza did not have access to the results of the stress test. Id. Nonetheless, Plaintiffs maintain that the remaining documentation "still indicated that Mr. Williams was high risk for a subsequent heart attack[.]" Id. Pedroza had an EKG performed on Williams, the results of which were abnormal, "revealing sinus tachycardia and a possible anterior myocardial infarction, age undetermined." Id. Despite these results and his medical history, Pedroza did not create a treatment plan for the chest pain. Id. Instead, Pedroza "diagnosed Mr. Williams with epigastric pain, treated him with prescription medications consisting of Tylenol,

Lidocaine, Maalox, and Protonix and then subsequently discharged him from the RMC urgent care[.]" Id. at 9-10. Plaintiffs contend that Williams actually experienced a heart attack that morning and that Pedroza failed to diagnosis it and treat it despite the presence of numerous risk factors. Id. at 10. On the afternoon of March 24, 2017, Williams again went to RMC's urgent care, "complaining of epigastric and chest pain again," where Dr. Rodriguez examined him. Id. Rodriguez treated Williams as if he were having a heart attack and performed FDOC's chest pain protocol while waiting for transport to Shands Hospital. Id. at 10-11. Sadly, Williams died before transport. Id. at 11.

Plaintiffs maintain that Salman failed to order additional treatment for Williams' heart issues and failed to timely transcribe the notes and results of the stress test prior to Williams' death. Id. They also contend that Pedroza failed to correctly diagnose and treat Williams that morning. Id. According to Plaintiffs, both Pedroza and Salman acted negligently and committed medical malpractice in the treatment of Williams and, as a result, should be liable under Florida's Wrongful Death Act. Id. at 12-13, 24-26. Likewise, they assert that MHM Health Professionals, Centurion, Mark Inch, and Jacksonville Cardiovascular Center are vicariously liable for Williams' death under Florida law. Id. at 14-18, 26-27. Plaintiffs additionally argue that Pedroza, Centurion,

and Salman violated Williams' rights under the Eighth Amendment and are liable under § 1983. Id. at 18-24, 27-29.

## IV. Constitutional Claims

The Court first addresses whether Plaintiffs have established a claim for relief under § 1983, because if not, the Court should not address Plaintiffs' state law claims. See Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088-89 (11th Cir. 2004) (noting that districts courts are encouraged "to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."). Plaintiffs allege constitutional claims against Pedroza, Salman, and Centurion.

Eight Amendment Standard

Pursuant to the Eighth Amendment to the United States Constitution, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). "To establish an Eighth Amendment violation, a prisoner must satisfy both an

8

objective and subjective inquiry regarding a prison official's conduct." Oliver v. Fuhrman, 739 F. App'x 968, 969 (11th Cir. 2018) (citing Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)). The Eleventh Circuit has explained:

> Under the objective component, a prisoner must allege a condition that is sufficiently serious to violate the Eighth Amendment. Id. The challenged condition must be extreme and must pose an unreasonable risk of serious damage to the prisoner's future health or safety. Id. The Eighth Amendment guarantees that prisoners are provided with a minimal civilized level of life's basic necessities. Id.
>
> Under the subjective component, a prisoner must allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference. Id. This means the prisoner must show that the prison officials: (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) displayed conduct that is more than mere negligence. Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003).

Id. at 969-70. "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." Whitley v. Albers, 475 U.S. 312, 319 (1986).

As it relates to medical care, "[t]he Supreme Court has interpreted the Eighth Amendment to prohibit 'deliberate indifference to serious medical needs of prisoners.'" Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016)

(quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976)). The Eleventh circuit has explained that

> To prevail on a deliberate indifference claim, [a plaintiff] must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1306-07 (11th Cir.2009). To establish deliberate indifference, [a plaintiff] must prove "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." <u>Townsend v. Jefferson Cnty.</u>, 601 F.3d 1152, 1158 (11th Cir.2010) (alteration in original). The defendants must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and then actually draw that inference. <u>Farrow v. West</u>, 320 F.3d 1235, 1245 (11th Cir.2003) (quotation omitted).

<u>Easley v. Dep't of Corr.</u>, 590 F. App'x 860, 868 (11th Cir. 2014). "For medical treatment to rise to the level of a constitutional violation, the care must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" <u>Nimmons v. Aviles</u>, 409 F. App'x 295, 297 (11th Cir. 2011) (quoting <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir.1991)); <u>see also</u> <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1033 (11th Cir. 1989) ("Grossly incompetent or inadequate care can constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment" or failure to respond to a known medical problem). However, the law is well settled that the Constitution is not implicated by the

negligent acts of corrections officials and medical personnel. Daniels v. Williams, 474 U.S. 327, 330-31 (1986); Davidson v. Cannon, 474 U.S. 344, 348 (1986) ("As we held in Daniels, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). A complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) (quotation marks and citation omitted). Moreover, the Eleventh Circuit has noted that "[n]othing in our case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor; to the contrary, it is well established that 'a simple difference in medical opinion' does not constitute deliberate indifference." Bismark v. Fisher, 213 F. App'x 892, 897 (11th Cir. 2007) (quoting Waldrop, 871 F.2d at 1033). Similarly, "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding

liability under the Eighth Amendment." <u>Adams v. Poag</u>, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted).

<u>Claims Against Pedroza</u>

In his motion to dismiss, Pedroza argues that, at best, Plaintiffs have alleged classic negligence and have not made factual allegations to support their legal conclusions that Pedroza violated the Eighth Amendment. Pedroza Motion at 2, 16-25. Pedroza does not dispute that Plaintiffs have alleged that Williams had an objectively serious medical need that, if not addressed, "posed a risk of serious harm." <u>Id.</u> at 17. However, he asserts that Plaintiffs did not allege Pedroza had subjective knowledge of that risk. <u>Id.</u> at 17-25. Instead, Pedroza maintains that Plaintiffs' own allegations show that Pedroza examined and treated Williams, albeit not in the manner Plaintiffs think he should have, which refute Plaintiffs' arguments that Pedroza purposely denied treatment in a deliberately indifferent manner. <u>Id.</u> According to Pedroza, Plaintiffs' allegations present a dispute over Pedroza's medical judgment and the adequacy of the medical attention Williams received. <u>Id.</u> Pedroza contends that Plaintiffs have not made allegations that "Pedroza knew Williams was suffering from a cardiac event but refused to obtain the necessary medical

treatment." Id. at 19. As such, Pedroza avers that they have not stated a claim for relief under § 1983. Id. at 16-25.

Plaintiffs disagree. See generally Pedroza Response. They assert that Pedroza has mischaracterized or omitted several of Plaintiffs' allegations in arguing that they failed to state a claim for relief under § 1983. Id. at 5-7. According to Plaintiffs, a heart condition is a serious medical condition. Id. at 11. Plaintiffs contend that Pedroza's subjective knowledge of Williams' "serious medical need was evidenced by:  (1) patient's known medical history, which included Dr. Salman's medical note requesting a Lexican Nuclear Stress Test with urgency; (3) [sic] decedent's EKG results reviewed by Pedroza the morning which preceded the decedent's death later that same day; and (4) Pedroza's specific medical findings and detailed risk factors generated from his patient encounter with the decedent." Id. at 11-12 (emphasis in original). Plaintiffs maintain that Pedroza should have known that Williams was having a heart attack that morning because of Williams' medical history, his transfer to RMC for his cardiac issues, Williams' complaint of chest pains that morning, and the medical data collected from Williams that morning. Id. at 12-13. They assert that the risks were so obvious that Pedroza's subjective knowledge of that risk can be inferred. Id. Plaintiffs further argue that Pedroza's delay in treating Williams' heart attack states a prima facie case of deliberate

indifference and that Pedroza's ineffective treatment measure amounted to no treatment at all. Id. at 13-14.

The Eleventh Circuit has explained "[t]o be deliberately indifferent a prison official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Franklin v. Curry, 738 F.3d 1246, 1250 (11th Cir. 2013) (quoting Goodman v. Kimbrough, 718 F.3d 1325, 1332 (11th Cir. 2013)) (emphasis added). Here, Plaintiffs have alleged Pedroza knew Williams was having a heart attack the morning of March 24, 2017, because of various medical data available to Pedroza that morning. Complaint at 19. Plaintiffs have alleged facts from which an inference could be drawn that Williams would have a heart attack. As to whether Pedroza actually drew that inference, Plaintiffs assert in the response that they adequately alleged Pedroza's knowledge. Pedroza Response at 6. Specifically, they cite to the following section of the Complaint:

> In the alternative, at all times material, Dr. Pedroza knew Mr. Williams had a serious medical need as indicated by Mr. Williams' medical history; Dr. Salman's February 9, 2017, medical note requesting a Lexiscan Nuclear Stress Test with urgency; Mr. Williams' symptoms on the morning of March 24, 2017; and EKG result, all of which indicated that Mr. Williams was not only high-risk for a heart attack, but

14

<u>also was experiencing a heart attack on the morning
of March 24, 2017</u>.

Complaint at 19 (emphasis added except as to "urgency"). Pedroza contends
this portion of the Complaint contains only legal conclusions that are not
supported by factual allegations. Pedroza Motion at 18-19.

The Court notes that "the tenet that a court must accept as true all of
the allegations contained in a complaint is inapplicable to legal conclusions[,]
and "[t]hreadbare recitals of the elements of a cause of action, supported by
mere conclusory statements, do not suffice." <u>Iqbal</u>, 556 U.S. at 678. In <u>Iqbal</u>,
the United States Supreme Court concluded that the following allegation in
the complaint was a legal conclusion not entitled to be assumed true: defendant
"'knew of, condoned, and willfully and maliciously agreed to subject [him]' to
harsh conditions of confinement 'as a matter of policy, solely on account of [his]
religion, race, and/or national origin and for no legitimate penological
interest.'" <u>Id.</u> at 680.

Here, as in <u>Iqbal</u>, Plaintiffs' allegation that "Dr. Pedroza knew Mr.
Williams had a serious medical need as <u>indicated by</u>" the medical data is a
legal conclusion not entitled to an assumption of truth. Complaint at 19
(emphasis added). Beyond this conclusion, Plaintiffs do not allege that Pedroza
actually drew an inference from the medical data that Williams was
experiencing a heart attack that morning or that a heart attack was imminent.

Indeed, as Plaintiffs themselves assert, Pedroza's medical notes provide no indication that Pedroza even reviewed Williams' medical records. Id. at 9. Moreover, according to Plaintiffs, Williams was experiencing classic heart attack symptoms the morning of March 24, 2017, "that [were] not diagnosed." Id. at 10 (emphasis added). Here, Plaintiffs have not alleged facts showing Pedroza had subjective knowledge that Williams was having a heart attack or subjective intent to punish Williams. Nor have they alleged facts supporting an inference that Pedroza's response "was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnosi[s] or treat[ment],' or even '[m]edical malpractice' actionable under state law[.]" Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000) (quoting Estelle, 429 U.S. at 105-06). Thus, Plaintiffs have not alleged facts plausibly supporting a claim of an Eighth Amendment violation. See Farmer, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."). The factual allegations presented by Plaintiffs show that Pedroza diagnosed Williams with epistatic pain and treated him as such – likely a misdiagnosis or a failure to diagnosis. However, while such factual allegations may state a claim of negligence, they do not rise to the level of an

Eighth Amendment violation. <u>See</u> <u>Estelle</u>, 429 U.S. at 106 ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.). Accordingly, Pedroza's motion is due to be granted as to the Eighth Amendment claims against him.

<u>Claims Against Salman</u>

In his motion to dismiss, Salman argues that Plaintiffs have failed to state a claim for relief based on a violation of the Eighth Amendment and that he is entitled to qualified immunity. JCC Motion at 15-23. According to Salman, Plaintiffs have not alleged that he acted with deliberate indifference as defined under Eighth Amendment precedent. <u>Id.</u> at 21. Salman maintains that Plaintiffs' claim boils down to a difference in medical opinion, which is not actionable under § 1983. <u>Id.</u> Even if Plaintiffs did state a claim, Salman contends that he is entitled to qualified immunity because Plaintiffs have not shown that the alleged facts violated a clearly established right. <u>Id.</u> at 22. Instead, Salman asserts that Plaintiffs' allegations only support a negligence claim, which is not a constitutional violation. <u>Id.</u> at 23. Also, Salman avers that

there is no Supreme Court precedent similar to the current case and that his alleged actions were not obviously unconstitutional. Id.

Plaintiffs maintain that they sufficiently alleged an Eighth Amendment violation and Salman is not entitled to qualified immunity. Salman Response at 9-17. As to whether Salman acted with deliberate indifference, Plaintiffs contend that Salman subjectively knew Williams faced an imminent heart attack because Salman had access to Williams' medical history, tests performed, and Salman's own examination of Williams. Id. at 10-13. Salman oversaw the nuclear stress test, which showed that Williams previously suffered a heart attack and had coronary blockages, but failed to dictate the results of the stress test until approximately a month later, after Williams had died. Id. Plaintiffs argue that the risk was obvious and required urgent treatment, but Salman deliberately failed to act. Id.

In the Complaint, Plaintiffs assert that Salman was the cardiologist at RMC that examined Williams on February 9, 2017, and March 16, 2017. Complaint at 7. Plaintiffs maintain that Salman had access to Williams' medical records, which showed that he had a high risk of suffering a heart attack. Id. Additionally, they contend that Salman's examination of Williams verified additional risk factors for a heart attack. Id. at 7-8. Based on Williams' history and Salman's examination, Salman "recommended with urgency that

Mr. Williams undergo a Lexiscan Nuclear Stress Test." Id. at 8. On March 16, 2017, Salman oversaw the stress test and EKG, which showed that Williams had previously had a heart attack and had coronary blockage. Id. Despite Salman being aware of this data, Plaintiffs assert that he failed to provide any additional medical action or follow-up. Id. Moreover, Plaintiffs aver that Salman failed to dictate the results of the stress test until April 21, 2017, almost a month after Williams' death and prior to the events of March 24, 2017. Id. at 11-12. In the Claims section of the Complaint, Plaintiffs allege that Salman either diagnosed or knew Williams had a high risk of suffering a heart attack, because Salman was aware of Williams' complaints, medical history, and other health issues. Id. at 27-28. Additionally, they assert that Salman's decision to urgently request a stress test along with the results of the stress test and an EKG further demonstrates Salman's knowledge that Williams had a serious medical need. Id. at 28.

Plaintiffs have sufficiently alleged the objective component of a deliberate indifference claim. The Court turns to whether Plaintiffs have adequately alleged Salman acted with deliberate indifference, and finds that they have done so. Plaintiffs' allegations show Salman was so concerned with Williams' cardiac health that he "recommended with urgency" that Williams undergo a stress test. Plaintiffs have alleged the results of that stress test,

which Salman oversaw, were abnormal and provided data indicating Williams was at high risk for a future heart attack. Despite notating this information at the time, he failed to dictate the information into the FDOC database in a timely fashion. Additionally, one reasonably could infer the delay and Salman's failure to direct follow-up treatment unreasonably prolonged treatment in light the urgent nature of the known risk. At this stage of the proceedings, it is reasonable to infer from Plaintiffs' allegation that Salman's unexplained failure to continue any treatment or timely transcribe the stress test results amounted to deliberate indifference. See Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990) ("When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference."); Carswell v. Bay Cty., 854 F.2d 454, 457 (11th Cir. 1988) (quoting Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985)) ("Under section 1983 'knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference.'"); Granda v. Schulman, 372 F. App'x 79, 83 (11th Cir. 2010) ("Allegations of a delay in medical care for 'serious and painful injuries' also can state a claim for a

violation of the Eighth Amendment, especially where delay in treating a 'known or obvious' serious medical condition is unexplained".).

As to Salman's qualified immunity argument, unreasonable delay in treating a known serious risk has long been held to violate the Eighth Amendment. See id.; see also Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citations omitted) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent."). As such, the Court finds that Salman's motion is due to be denied as to Plaintiffs' Eighth Amendment claims against him.

Claims Against Centurion

Centurion contends that Plaintiffs have failed to allege an Eighth Amendment violation against it. Centurion Motion at 12-20. Specifically, like Pedroza and Salman, Centurion argues that Plaintiffs have not alleged an Eighth Amendment violation against either Pedroza or Salman. Id. Moreover, Centurion argues that other than legal conclusions, Plaintiffs have failed to allege that Centurion had a custom, policy, or practice that was the moving force behind Williams' death. Id.

In response, Plaintiffs argue that they sufficiently alleged Pedroza and Salman violated Williams' Eighth Amendment rights. Centurion Response at

4-11. Regarding Centurion's custom or policy, Plaintiffs assert that the claim presented in Ground VI of the Complaint properly alleged Centurion's policies - an inadequate chest pain policy and a policy of delayed diagnosis - were the driving force behind Williams' death Id. at 11-13. Additionally, Plaintiffs contend that they alleged these policies impacted other similarly situated patients. Id. at 13.

Centurion contracted with the Florida Department of Corrections to provide medical services to inmates within the state of Florida. Although Centurion is not a governmental entity, "[w]here a function which is traditionally the exclusive prerogative of the state … is performed by a private entity, state action is present" for purposes of § 1983. Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 703 (11th Cir. 1985) (citations omitted). Indeed,

> "when a private entity . . . contracts with a county to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state" and "becomes the functional equivalent of the municipality" under section 1983. Buckner v. Toro, 116 F.3d 450, 452 (11th Cir. 1997). "[L]iability under § 1983 may not be based on the doctrine of respondeat superior." Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc).

Craig v. Floyd Cty., Ga., 643 F.3d 1306, 1310 (11th Cir. 2011); see Denham v. Corizon Health, Inc., Case No. 6:13-cv-1425-Orl-40KRS, 2015 WL 3509294, at *3 n.1 (M.D. Fla. June 4, 2015) ("[W]hen a government function is performed

by a private entity like Corizon, the private entity is treated as the functional equivalent of the government for which it works.") (citation omitted), aff'd (11th Cir. Jan. 13, 2017).

Where a deliberate indifference medical claim is brought against an entity, such as Centurion, based upon its functional equivalence to a government entity, the assertion of a constitutional violation is merely the first hurdle in a plaintiff's case. This is so because liability for constitutional deprivations under § 1983 cannot be based on the theory of respondeat superior. Craig, 643 F.3d at 1310 (quoting Grech v. Clayton Cty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc)); see Denno v. Sch. Bd. Of Volusia Cty., 218 F.3d 1267, 1276 (11th Cir. 2000). Instead, a government entity may be liable in a § 1983 action "only where the [government entity] itself causes the constitutional violation at issue." Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla., 402 F.3d 1092, 1116 (11th Cir. 2005) (citations omitted). Thus, a plaintiff must establish that an official policy or custom of the government entity was the "moving force" behind the alleged constitutional deprivation. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 693-94 (1978).

In Monell, the Supreme Court held that local governments can be held liable for constitutional torts caused by official policies. However, such liability is limited to "acts which the [government entity] has officially sanctioned or

ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). Under the directives of Monell, a plaintiff also must allege that the constitutional deprivation was the result of "an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." Denno, 218 F.3d at 1276 (citations omitted); see Hoefling v. City of Miami, 811 F.3d 1271, 1279 (11th Cir. 2016) (stating Monell "is meant to limit § 1983 liability to 'acts which the municipality has officially sanctioned or ordered'"; adding that "[t]here are, however, several different ways of establishing municipal liability under § 1983").

"A policy is a decision that is officially adopted by the [government entity] or created by an official of such rank that he or she could be said to be acting on behalf of the [government entity]." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted). The policy requirement is designed to "'distinguish acts of the [government entity] from acts of employees of the [government entity], and thereby make clear that [governmental] liability is limited to action for which the [government entity] is actually responsible.'" Grech, 335 F.3d at 1329 n.5 (quotation and citation omitted). Indeed, governmental liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives'" by

governmental policymakers. <u>City of Canton v. Harris</u>, 489 U.S. 378, 389 (1989) (quoting <u>Pembaur</u>, 475 U.S. at 483-84). A government entity rarely will have an officially-adopted policy that permits a particular constitutional violation, therefore, in order to state a cause of action for damages under § 1983, most plaintiffs must demonstrate that the government entity has a custom or practice of permitting the violation. <u>See</u> <u>Grech</u>, 335 F.3d at 1330; <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." <u>Bd. Of Cty. Comm'rs of Bryan Cty., Okla. v. Brown</u>, 520 U.S. 397, 404 (1997) (citation omitted). The Eleventh Circuit has defined "custom" as "a practice that is so settled and permanent that it takes on the force of law" or a "persistent and wide-spread practice." <u>Sewell</u>, 117 F.3d at 489. Last, "[t]o hold the [government entity] liable, there must be 'a direct causal link between [its] policy or custom and the alleged constitutional deprivation.'" <u>Snow ex rel. Snow v. City of Citronelle</u>, 420 F.3d 1262, 1271 (11th Cir. 2005) (quotation omitted). Because Centurion's liability under § 1983 would be based on its functional equivalence to the government entity responsible for providing medical care and services to inmates, Plaintiffs

25

must plead that an official policy or a custom or practice of Centurion was the moving force behind Williams' alleged federal constitutional violation.

In the Complaint, Plaintiffs allege that Centurion contracted with FDOC to provide healthcare within the prison system. Complaint at 3. According to Plaintiffs, JCC and MHM were subcontractors of Centurion, and Salman worked as an agent of JCC, while Pedroza worked as an agent of MHM. Id. at 3-4. Plaintiffs assert that Salman did not follow a Centurion policy that required "medical notes for patient encounters with specialist physicians to be submitted to the FL DOC 'on-site practitioner with complete consult report and other appropriate records within 5 business days of seeing the inmate patient.'" Id. at 12. In the Claims section of the Complaint, Plaintiffs contend that Centurion's chest pain protocol constitutes a policy, custom, or practice that was the moving force behind Williams' death. Id. at 23. Plaintiffs maintain that the chest pain protocol is inadequate and antiquated because it does not mandate testing for troponin levels and provides inadequate medical care to patients even when the chest pain protocol does not rule out a current myocardial infarction. Id. Plaintiffs contend that Centurion's chest pain protocol deliberately delays diagnosis and treatment of cardiac care to avoid transferring patients to non-governmental agency hospital facilities for costly

treatments and denies urgent and necessary medical care for chest pain until the patient's condition is an emergency. Id.

Plaintiffs have identified a specific policy, custom, or practice. However, their factual allegations do not show that the policy custom, or practice was the driving force behind Williams' death. As it relates to Pedroza, as explained above, Plaintiffs' allegations do not state a claim of deliberate indifference but rather, at most, may state a claim of medical malpractice. Indeed, Plaintiffs allege Pedroza failed to diagnosis Williams' heart attack that morning, but they do not allege that Pedroza failed to do so because he followed the chest pain protocol or any other policy, custom, or practice. Similarly, as to Salman, there are no factual allegations that Salman failed to timely transcribe the stress test results because of a policy, custom, or practice. In fact, to the contrary, Plaintiffs allege that Centurion had a policy that required medical notes from patient encounters be submitted within five business days of the examination, but Salman failed to act in accordance with the policy. Complaint at 12. Plaintiffs also have not asserted facts supporting any inference that Salman failed to provide additional treatment because of the chest pain protocol or because of a cost-saving policy. Although Plaintiffs state legal

conclusions in the Claims section of the Complaint, there are no factual allegations to support those conclusions.

To the extent Plaintiffs contend the chest pain protocol was the driving force behind Williams' death because it was inadequate, this is not sufficient to state an Eighth Amendment claim. This is so because it demonstrates, at most, medical malpractice in the construction of the policy. See Monteleone v. Corizon, 686 F. App'x 655, 661 (11th Cir. 2017). As it relates to Plaintiffs' assertion that Centurion has a policy to deliberately delay diagnosis and treatment for patients with cardiac issues in order to save money, Plaintiffs present only legal conclusions devoid of any well pled allegations of fact in support of that conclusion. Moreover, "the Eighth Amendment does not prohibit prison officials from considering cost in determining what type (or level) of medical care inmates should receive." Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1277 (11th Cir. 2020). However, "if a particular course of treatment is indeed essential to 'minimally adequate care,' prison authorities can't plead poverty as an excuse for refusing to provide it." Id. The Eleventh Circuit has emphasized that "minimally adequate care" is "quite minimal" under the Eighth Amendment. Id.; see also Harris, 941 F.2d at 1510 (quoting Brown v. Beck, 481 F. Supp. 723, 726 (S.D. Ga. 1980)) (recognizing that medical care is not constitutionally required to be "'perfect, the best obtainable, or even

very good.'"). Here, Plaintiffs have alleged Williams received medical care from both Pedroza and Salman, although they contend Pedroza failed to diagnosis a heart attack and Salman inexplicitly failed to continue treatment. But, Plaintiffs have not shown that any alleged cost-savings policy was the impetus behind these alleged failures. As such, Plaintiffs have not stated a claim for relief under the Eighth Amendment as to Centurion.

## V. State Law Claims

### Damages and Attorney Fees

Defendants Pedroza, JCC, Salman, MHM, and Centurion contend that Plaintiffs cannot recover damages for Williams' pain and suffering because such damages are not permitted under Florida's Wrongful Death Act. See Centurion Motion at 9-11; Pedroza Motion at 15-16; MHM Motion at 4-5; JCC Motion at 24-25. These same Defendants also argue that Plaintiffs are not entitled to attorney fees on their state law claims against them because there is no contract or statute entitling Plaintiffs to such fees. See Centurion Motion at 11-12; Pedroza Motion at 16; MHM Motion at 4-5; JCC Motion at 25.

Plaintiffs assert that a motion to dismiss is not the proper vehicle through which to challenge insufficiently alleged damages. See Pedroza Response at 20; MHM Response at 8-10; Salman Response at 20; JCC Response at 7-10; Centurion Response at 16-19. Nonetheless, Plaintiffs do not

disagree that they cannot recover damages for Williams' pain and suffering. Id. Instead, they contend Defendants have mischaracterized their prayer for relief. Id. According to Plaintiffs, although they alleged Williams had pain and suffering, they did not allege that as the basis for damages. Id. As to attorney fees, Plaintiffs withdraw their request for attorney fees and litigation costs with respect to their state law claims. Pedroza Response at 20; MHM Response at 10-11; Salman Response at 20; JCC Response at 10-11; Centurion Response at 17-20.

Concerning Plaintiffs' request for damages, the Court agrees with Plaintiffs that when read in context, they are not requesting damages for decedent's pain and suffering. Instead, they request damages on behalf of all beneficiaries for "sustained loss of net worth accumulations, loss of support and services, loss of companionship and protection, loss of instruction and guidance, merged mental pain and suffering, estate administration, financial assessments, legal expenses, and funeral with burial costs." Complaint at 21. As such, to the extent Pedroza, JCC, Salman, MHM, and Centurion seek to dismiss the claims against them based on the requested relief for damages, the motions to dismiss are due to be denied. Regarding attorney fees, in light of

Plaintiffs' withdrawal of a demand for attorney fees and costs in their state law claims, the motions to dismiss are due to be denied as moot on this issue.

<u>Claims Against Secretary Inch</u>

In his motion to dismiss, Secretary Inch argues that the state law claim against him should be dismissed for a number of reasons. The Court finds it unnecessary to address the arguments raised here because Inch is entitled to Eleventh Amendment Immunity.[1] Plaintiffs sue Inch in his official capacity. The United States Supreme Court has held that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 70 (1989). Ultimately, "it is no different from a suit against the State itself." <u>Id.</u> Thus, Plaintiffs' claim against Inch is actually a claim against the State of Florida. Pursuant to the Eleventh Amendment, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. While section 768.28, waives Florida's sovereign immunity in state court, it does not waive its Eleventh Amendment immunity in federal court.

---

[1] Courts can raise the issue of Eleventh Amendment immunity sua sponte. <u>See</u> <u>Mclendon v. Georgia Dep't of Community Health</u>, 261 F.3d 1252, 1259 (11th Cir. 2001).

See Schopler v. Bliss, 903 F.2d 1373, 1379 (11th Cir. 1990). Therefore, Inch is immune under the Eleventh Amendment to Plaintiffs' wrongful death claim to the extent it is brought in federal court. As such, Inch is due to be dismissed as a Defendant from this action.[2]

Sovereign Immunity

Both Pedroza and Salman argue in their respective motions to dismiss that they are entitled to sovereign immunity as to Plaintiffs' state law claims. Pedroza Motion at 6-15; JCC Motion at 7-15. Both physicians assert that, as individually named state agents, they are immune from suit under section 768.28(9), Florida Statutes because Plaintiffs have not alleged that they were acting outside the scope of their employment or that they acted in bad faith, with malicious purpose, or a wanton and willful disregard of human rights. Id.

Plaintiffs contend that they did not allege Pedroza or Salman were agents or employees of FDOC and are not suing them as such. Pedroza Response at 18-19; Salman Response at 17-19. Instead, Plaintiffs assert that they are suing both as independent physicians who were agents of MHM and JCC respectively. Id. According to Plaintiffs, discovery has yet to evolve to the

---

[2] A dismissal on the basis of Eleventh Amendment immunity is a dismissal for lack of jurisdiction and as such must be without prejudice. See Nichols v. Ala. State Bar, 815 F.3d 726, 733 (11th Cir. 2016).

level necessary to determine whether Pedroza or Salman were agents of FDOC, and, because Plaintiffs have not alleged they were agents of FDOC, their motions should be denied. <u>Id.</u> Upon review of the Amended Complaint, Plaintiffs have not alleged an agency relationship between either Pedroza or Salman with FDOC. As such, Pedroza and Salman's motion to dismiss based on sovereign immunity is due to be denied.

In consideration of the foregoing, it is now

**ORDERED**:

1.     Defendant Mark Inch's motion to dismiss (Doc. 84) is **DENIED as moot**. Defendant Inch is entitled to Eleventh Amendment Immunity and is **DISMISSED WITHOUT PREJUDICE** from this action.

2.     Defendant Centurion's motion to dismiss (Doc. 88) is **GRANTED in part and DENIED in part**. Plaintiffs' § 1983 claim against Centurion (Count Six) is **DISMISSED WITH PREJUDICE**, and the motion is otherwise **DENIED**.

3.     Defendant Pedroza's motion to dismiss (Doc. 89) is **GRANTED in part and DENIED in part**. Plaintiffs' § 1983 claim against Pedroza (Count Five) is **DISMISSED WITH PREJUDICE**, and the motion is otherwise **DENIED**.

4.     Defendant MHM's motion to dismiss (Doc. 90) is **DENIED**.

5. Defendants JCC and Salman's motion to dismiss (Doc. 91) is **DENIED**.

6. Plaintiffs' requests for attorney fees on Counts One, Two, Three, Four, Seven, and Eight are **WITHDRAWN**.

**DONE AND ORDERED** at Jacksonville, Florida, this 3rd day of January, 2022.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-8

c:
Counsel of Record